**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO.  0:15-CV-60423-WJZ

**FEDERAL TRADE COMMISSION**,

**STATE OF COLORADO**,

**STATE OF FLORIDA**,

**STATE OF INDIANA**,

**STATE OF KANSAS**,

**STATE OF MISSISSIPPI**,

**STATE OF MISSOURI**,

**STATE OF NORTH CAROLINA**,

**STATE OF OHIO**,

**STATE OF TENNESSEE**, and

**STATE OF WASHINGTON**,

      Plaintiffs,

v.

**CARIBBEAN CRUISE LINE, INC.**, a Florida corporation,

**LINKED SERVICE SOLUTIONS, LLC**, a Florida limited liability company,

**ECONOMIC STRATEGY LLC**, a Florida limited liability company,

**PACIFIC TELECOM COMMUNICATIONS GROUP**, a Nevada corporation,

**INTERNATIONAL TELEPHONE CORPORATION**, a foreign corporation,

**INTERNATIONAL TELEPHONE, LLC**, a Wyoming limited liability company,

**TELEPHONE MANAGEMENT CORPORATION**, an Oregon corporation,

**T M CALLER ID, LLC**, an Oregon limited liability company,

**SCOTT BROOMFIELD**, individually and as an officer, director or owner of Linked Service Solutions, LLC,

**JASON BIRKETT**, individually and as an officer, director or owner of Linked Service Solutions, LLC,

**JACOB DEJONGH**, individually and as an officer, director or

owner of Economic Strategy LLC,

**FRED ACCUARDI**, individually and as an officer, director, or owner of Pacific Telecom Communications Group, International Telephone Corporation, International Telephone, LLC, Telephone Management Corporation and T M Caller ID, LLC, and

**STEVE HAMILTON**, individually and as an officer, director, or owner of Pacific Telecom Communications Group,

Defendants.

## FIRST AMENDED COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION, AND OTHER EQUITABLE RELIEF

Plaintiffs the Federal Trade Commission ("Commission"), pursuant to Section 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 56(a)(1), and the States of Colorado, Florida, Indiana, Kansas, Mississippi, Missouri, North Carolina, Ohio, and Washington through their Attorneys General, and the State of Tennessee through the Tennessee Regulatory Authority (collectively "Plaintiffs") for their Complaint allege:

1.      The Commission brings this action under Sections 5(a), 5(m)(1)(A), 13(b), 16(a) and 19 of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a) and 57b, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105, to obtain monetary civil penalties, temporary, preliminary, and permanent injunctive relief, disgorgement, damages and other equitable relief from Defendants for their violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, as amended.

2.      The State of Colorado, by and through its Attorney General, Cynthia H. Coffman, brings this action pursuant to the Telemarketing Act, 15 U.S.C. § 6101 *et seq*., in order to obtain damages, restitution, other compensation, temporary, preliminary, and permanent injunctive

relief, other equitable relief, and other relief as the court may deem appropriate, from Defendants.

3.      The State of Florida, by and through its Attorney General, Pamela Jo Bondi, brings this action pursuant to the Telemarketing Act, 15 U.S.C. § 6101 *et seq*., and Section 501.207(1) of the Florida Statutes, in order to obtain monetary civil penalties, temporary, preliminary, and permanent injunctive relief, and other equitable relief from Defendants.

4.      The State of Indiana, by and through its Attorney General, Gregory F. Zoeller, and Deputy Attorney General, Marguerite M. Sweeney, brings this action pursuant to the Telemarketing Act, 15 U.S.C. § 6101 *et seq*., in order to obtain monetary damages, temporary, preliminary, and permanent injunctive relief, and other equitable relief from Defendants.

5.      The State of Kansas, by and through its Attorney General, Derek Schmidt, and Assistant Attorney General, Meghan E. Stoppel, brings this action pursuant to the Telemarketing Act, 15 U.S.C. § 6101 *et seq*., in order to obtain monetary damages, temporary, preliminary, and permanent injunctive relief, and other equitable relief from Defendants.

6.      The Mississippi Public Service Commission, by and through the Mississippi Attorney General Jim Hood, brings this action pursuant to the Telemarketing Act, 15 U.S.C. § 6101 *et seq*., in order to obtain monetary damages, temporary, preliminary, and permanent injunctive relief, and other equitable relief from Defendants.

7.      The State of Missouri, by and through its Attorney General, Chris Koster, brings this action pursuant to the Telemarketing Act, 15 U.S.C. § 6101 *et seq*., in order to obtain monetary civil penalties; temporary, preliminary, and permanent injunctive relief; court, investigative, and prosecution costs; and other equitable relief from Defendants.

8.      The State of North Carolina, by and through its Attorney General, Roy Cooper, brings this action pursuant to the Telemarketing Act, 15 U.S.C. § 6101 *et seq*., the North Carolina Telephone Solicitations Act, N.C. Gen. Stat. § 75-100, *et seq*., and the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq*., in order to obtain monetary civil penalties, temporary, preliminary, and permanent injunctive relief, costs and attorneys' fees from Defendants.

9.      The State of Ohio, by and through its Attorney General, Michael DeWine, brings this action pursuant to the Telemarketing Act, 15 U.S.C. § 6101 *et seq*., in order to obtain monetary damages, temporary, preliminary, and permanent injunctive relief, and other equitable relief from Defendants.

10.      The State of Tennessee, by and through the Tennessee Regulatory Authority, and its General Counsel Jean Stone and Legal Counsel, Shiva K. Bozarth, brings this action pursuant to the Telemarketing Act, 15 U.S.C. § 6101 *et seq*.,  in order to obtain monetary damages, temporary, preliminary, and permanent injunctive relief, and other equitable relief from Defendants.

11.      The State of Washington, by and through its Attorney General, Robert Ferguson, and Assistant Attorney General, Sarah Shifley, brings this action pursuant to the Telemarketing Act, 15 U.S.C. § 6101 *et seq*., in order to obtain monetary damages, temporary preliminary, and permanent injunctive relief, and other equitable relief from Defendants.

## **INTRODUCTION**

12.      Between October 2011 and July 2012, Economic Strategy LLC ("Economic Strategy"), Linked Service Solutions, LLC ("LSS") and Caribbean Cruise Line, Inc. ("CCL")

(collectively, the "Cruise Call Telemarketers") bombarded American consumers with billions of robocalls, an average of 12-15 million calls per day.

13.     Consumers who answered the Cruise Call Telemarketers' robocalls heard the following prerecorded message, or a nearly identical version:

> Hello, this is John from Political Opinions of America.  You've been carefully selected to participate in a short 30 second research survey and for participating you'll receive a free two day cruise for two people to the Bahamas, courtesy of one of our supporters.  Gratuities and a small port tax will apply.  To begin the survey, please press 1 now.  To decline the survey and be removed from our list, press 9.  Thank you.

14.     The Cruise Call Telemarketers' prerecorded call then asked consumers several automated political survey questions.  After completing the survey questions, consumers heard a recording stating that they were entitled to "a free cruise to the Bahamas" as a reward for taking the survey.  Consumers were then instructed to press 1 if they were interested in receiving the "free" cruise.

15.     Consumers who pressed 1 were then transferred to a live telemarketer working on behalf of CCL to market cruises.  The telemarketer would inform consumers that the "free" cruise would cost $59 per person in port taxes and attempt to sell them pre-boarding hotels, cruise excursions, enhanced accommodations, and other travel packages.

16.     Pacific Telecom Communications Group, International Telephone Corporation, International Telephone, LLC, T M Caller ID, LLC and Telephone Management Corporation (collectively, the "TMC Companies") assisted and facilitated their clients, including the Cruise Call Telemarketers, in their illegal calling campaigns in numerous ways.  *First*, the TMC Companies made it possible for the Cruise Call Telemarketers and other clients to spoof Caller ID information by supplying them with a large quantity of phone numbers that would appear on consumers' phones or Caller ID devices when they received telemarketing calls.  *Second*, the

TMC Companies provided the Cruise Call Telemarketers and other clients the ability to choose (and change) the calling party names that displayed with each Caller ID number.  *Third*, the TMC Companies helped fund the Cruise Call Telemarketers' and other clients' robocalling campaigns by sharing "dip fees" generated every time a consumer's phone carrier had to look up a Caller ID number used by the Cruise Call Telemarketers or other clients.  And *fourth*, the TMC Companies hid the Cruise Call Telemarketers' and other clients' identities when responding to law enforcement subpoenas and civil investigative demands seeking such information.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355, and 15 U.S.C. §§ 45(m)(1)(A), 53(b), 56(a) and 57b, and over the claims of the States of Colorado, Florida, Indiana, Kansas, Mississippi, Missouri, North Carolina, Ohio, Tennessee and Washington under 28 U.S.C. § 1367.  This action arises under 15 U.S.C. § 45(a).

18.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (d) and 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFFS

19.    Plaintiff the Commission is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The Commission enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The Commission also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the Telemarketing Act, the Commission promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

20.     Pursuant to the authority found in the Telemarketing Act at 15 U.S.C. § 6103(a), Plaintiff State of Colorado is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, other compensation, and other relief as the court may deem appropriate on behalf of Colorado residents.

21.     Plaintiff State of Florida is one of the fifty sovereign states of the United States, and by and through its Attorney General, Pamela Jo Bondi, it brings this action under Section 501.207(1) of the Florida Statutes.  Pursuant to the authority found in the Telemarketing Act at 15 U.S.C. § 6103(a), Plaintiff Florida is also authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Florida residents.  The Florida Attorney General has conducted an investigation, and Florida Attorney General Pamela Jo Bondi has determined that an enforcement action serves the public interest.  This Court has supplemental jurisdiction over Plaintiff Florida's state law claims under 28 U.S.C. § 1367.

22.     Pursuant to the authority found in the Telemarketing Act at 15 U.S.C. § 6103(a), Plaintiff State of Indiana is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Indiana residents.

23.     Pursuant to the authority found in the Telemarketing Act at 15 U.S.C. § 6103(a), Plaintiff State of Kansas is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Kansas residents.

24.     Pursuant to the authority found in the Telemarketing Act at 15 U.S.C. § 6103(f)(2), Plaintiff Mississippi Public Service Commission, the entity in Mississippi assigned to enforce the No Call program in Mississippi, is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Mississippi residents.

25.     Pursuant to authority found in the Telemarketing Act at 15 U.S.C. § 6103(a), Plaintiff State of Missouri is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Missouri residents.

26.     Plaintiff State of North Carolina is one the fifty sovereign states of the United States, and by and through its Attorney General, Roy Cooper, it brings this action under N.C. Gen. Statutes §§ 75-14 and 105(a).  Pursuant to the authority found in the Telemarketing Act at 15 U.S.C. § 6103(a), Plaintiff of North Carolina is also authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of North Carolina residents.  This Court has supplemental jurisdiction over Plaintiff North Carolina's state law claims under 28 U.S.C. § 1367.

27.     Pursuant to the authority found in the Telemarketing Act at 15 U.S.C. § 6103(a), Plaintiff State of Ohio is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Ohio residents.

28.     Pursuant to the authority found in the Telemarketing Act at 15 U.S.C. § 6103(f)(2), Plaintiff State of Tennessee is authorized to initiate federal district court proceedings

to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Tennessee residents.

29.     Pursuant to the authority found in the Telemarketing Act at 15 U.S.C. § 6103(a), Plaintiff State of Washington is authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Washington residents.

## **DEFENDANTS**

30.     Defendant Caribbean Cruise Line, Inc. ("CCL") is a for-profit Florida corporation with its principal place of business at 2419 East Commercial Boulevard, Fort Lauderdale, Florida.  CCL markets and sells cruise and vacation packages.  CCL is a seller and telemarketer of goods or services to consumers that has caused other telemarketers, such as Defendant Linked Service Solutions, LLC and Economic Strategy LLC, to call consumers to induce the purchase of goods or services from CCL.  CCL transacts or has transacted business in this District and throughout the United States.

31.     Defendant Linked Service Solutions, LLC ("LSS") is a for-profit Florida limited liability company with its principal place of business at 7000 Winding Lake Circle, Oviedo, Florida.  LSS is a telemarketer that placed outbound telephone calls to induce consumers to purchase goods or services from CCL.  LSS transacts or has transacted business in this District and throughout the United States.

32.     Defendant Economic Strategy LLC ("Economic Strategy") is a for-profit Florida limited liability company with its principal place of business at 10060 Lake Cove Drive, Suite K101, Fort Myers, Florida.  Economic Strategy is a telemarketer that placed outbound telephone

calls to induce consumers to purchase goods or services from CCL.  Economic Strategy transacts or has transacted business in this District and throughout the United States.

33.     Defendant Pacific Telecom Communications Group ("Pacific Telecom") is a for-profit Nevada corporation with its principal place of business at 12228 Venice Boulevard, Suite 559, Los Angeles, California.  At times material to this Complaint, acting alone or in concert with others, Pacific Telecom has assisted and facilitated the acts or practices set forth in this Complaint.  Pacific Telecom transacts or has transacted business in this District and throughout the United States.

34.     Defendant International Telephone Corporation ("ITC") is a foreign for-profit corporation with its principal place of business at 2331 SW 5th Avenue, Portland, Oregon.  At times material to this Complaint, acting alone or in concert with others, ITC has assisted and facilitated the acts or practices set forth in this Complaint.  ITC transacts or has transacted business in this District and throughout the United States.

35.     Defendant International Telephone, LLC ("IT LLC") is a for-profit Wyoming corporation with its principal place of business at 2331 SW 5th Avenue, Portland, Oregon.  At times material to this Complaint, acting alone or in concert with others, IT LLC has assisted and facilitated the acts or practices set forth in this Complaint.  IT LLC transacts or has transacted business in this District and throughout the United States.

36.     T M Caller ID, LLC ("T M Caller ID") is a for-profit Oregon corporation with its principal place of business at 2331 SW 5th Avenue, Portland, Oregon.  At times material to this Complaint, acting alone or in concert with others,  T M Caller ID has assisted and facilitated the acts or practices set forth in this Complaint.  T M Caller ID has transacted business in this District and throughout the United States.

37.     Telephone Management Corporation ("TMC") is a for-profit Oregon corporation with its principal place of business at 2331 SW 5th Avenue, Portland, Oregon.  At times material to this Complaint, acting alone or in concert with others, TMC has assisted and facilitated the acts or practices set forth in this Complaint.  TMC transacts or has transacted business in this District and throughout the United States.

38.     Defendant Scott Broomfield is an owner, director and manager of LSS.  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of LSS set forth in this Complaint.  Defendant Broomfield, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

39.     Defendant Jason Birkett is an owner, director and manager of LSS.  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of LSS set forth in this Complaint.  Defendant Birkett, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

40.     Defendant Jacob deJongh is an owner and manager of Economic Strategy.  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Economic Strategy set forth in this Complaint.  Defendant deJongh resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

41.     Defendant Fred A. Accuardi is an owner and CEO of Pacific Telecom, an owner and President of TMC, and an owner and manager of ITC, IT LLC, and T M Caller ID.  At times

material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Pacific Telecom, ITC, IT LLC, T M Caller ID and TMC set forth in this Complaint.  Defendant Accuardi, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

42.     Defendant Steve Hamilton is an owner and President of Pacific Telecom.  At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Pacific Telecom set forth in this Complaint.  Defendant Hamilton, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

43.     CCL, LSS, Economic Strategy, Broomfield, Birkett and deJongh are hereinafter collectively referred to as the "Cruise Call Defendants."

44.     Pacific Telecom, ITC, IT LLC, T M Caller ID, TMC, Accuardi and Hamilton are hereinafter collectively referred to as the "Pacific Telecom Defendants."

## COMMON ENTERPRISE

45.     Defendants Pacific Telecom Communications Group, International Telephone Corporation, International Telephone, LLC, T M Caller ID, LLC and Telephone Management Corporation (the "TMC Enterprise" or "TMCE") have operated as a common enterprise while engaging in the acts and practices alleged below.  TMC was the original member of the common enterprise beginning in 2007.  T M Caller ID was incorporated later that same year and took over relevant business operations from TMC in approximately September 2008.   ITC and IT, LLC subsequently joined the common enterprise in July 2011 as successors to T M Caller ID, which

ceased operations in September 2011.  Finally, Pacific Telecom joined the common enterprise on

or about July 15, 2011, when Accuardi acquired a majority interest in the company.

46.     The TMC Enterprise conducted the business practices described below through an

interrelated network of companies that have common ownership, officers, managers, business

functions, employees and office locations.  Because the TMC Enterprise operated as a common

enterprise, each of the entities that comprise the enterprise is jointly and severally liable for the

acts and practices of Pacific Telecom, ITC, IT LLC, T M Caller ID and TMC during the time in

which they participated in the common enterprise.  At times, Defendant Accuardi formulated,

directed, controlled, had the authority to control, or participated in the acts and practices of the

TMC Enterprise.  Beginning July 15, 2011, Defendant Hamilton also formulated, directed,

controlled, had the authority to control, or participated in the acts and practices of the TMC

Enterprise.

## COMMERCE

47.     At all times material to this Complaint, Defendants have maintained a substantial

course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

15 U.S.C. § 44.

## THE TELEMARKETING SALES RULE

48.     Congress directed the Commission to prescribe rules prohibiting abusive and

deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-

6108.  The Commission adopted the original TSR in 1995, extensively amended it in 2003, and

amended certain provisions thereafter.  16 C.F.R. Part 310.

49.     Among other things, the 2003 amendments to the TSR established a do-not-call

registry, maintained by the Commission (the "National Do Not Call Registry" or "Registry"), of

consumers who do not wish to receive certain types of telemarketing calls.  Consumers can

register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at *donotcall.gov*.

50.     Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered, through a toll-free telephone call or over the Internet at *donotcall.gov*, or by otherwise contacting law enforcement authorities.

51.     The Commission allows sellers, telemarketers, and other permitted organizations to access the Registry over the Internet at *telemarketing.donotcall.gov*, to pay the fee(s) if required, and to download the numbers not to call.

52.     Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution. 16 C.F.R. § 310.2(v).

53.     The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to numbers on the Registry in violation of the TSR.  16 C.F.R. § 310.4(b)(1)(iii)(B).

54.     The TSR also prohibits sellers and telemarketers from initiating an outbound telephone call to any person when that person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered.  16 C.F.R. § 310.4(b)(1)(iii)(A).

55.     As amended, effective September 1, 2009, 16 C.F.R. § 310.4(b)(1)(v) of the TSR prohibits initiating an outbound telephone call that delivers a prerecorded message to induce the purchase of any good or service unless the seller has obtained from the recipient of the call an express agreement, in writing, that evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller.  The express agreement must include the recipient's telephone number and signature, must be obtained after a

clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person, and must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service. 16 C.F.R. § 310.4(b)(1)(v)(A).

56.     The TSR requires that sellers and telemarketers transmit or cause to be transmitted the telephone number of the telemarketer and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call, or transmit the customer service number of the seller on whose behalf the call is made and, when made available by the telemarketer's carrier, the name of the seller. 16 C.F.R. § 310.4(a)(8).

57.     It is a violation of the TSR for any person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any practice that violates Sections 310.3(a), (c) or (d), or 310.4 of the TSR. 16 C.F.R. § 310.3(b).

58.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

59.     Pursuant to Sections 501.203(3)(a) and (c), and 501.207, Fla. Stat., a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) and therefore in violation of Florida's Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Fla. Stat. ("FDUTPA").

60.     Pursuant to N.C. Gen. Stat. § 75-102(e), a violation of the TSR constitutes a violation of the North Carolina Telephone Solicitors Act, N.C. Gen. Statutes § 75-100, *et seq*.  It also constitutes a violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Statutes § 75-1.1, *et seq*.

## THE CRUISE CALL DEFENDANTS' BUSINESS ACTIVITIES

### Billions of Illegal Robocalls Used as a Lead Generation Tool

61.     Broomfield and Birkett created LSS in July 2011 to sell CenturyLink cable service door-to-door.  When that endeavor failed, they brainstormed other ways to make money.  Their solution: a scheme to use survey robocalls as a lead generation tool.

62.     The robocall lead generation plan required: (1) political action committees ("PACs") that wished to make survey robocalls at no cost and (2) a lead buyer that would pay to have callers transferred to the lead buyer's telemarketers.  Birkett and Broomfield enlisted deJongh (Birkett's cousin) to find PACs interested in free survey robocalls and pitched CCL with the idea of using the robocalls as a lead generation tool for CCL, *i.e.*, a way to identify potential customers.

### *The Funds*

63.     Broomfield told CCL that he could deliver a large number of leads by pitching CCL's "free cruise" during the survey calls.  CCL agreed to purchase the leads from LSS.  CCL agreed to pay LSS between $2 and $3 per lead for all leads who listened to at least 30 seconds of the CCL "free cruise" sales pitch.

### *The Product*

64.     In order to take the CCL cruise, consumers had to pay $118 in "port fees" for a double-occupancy cruise.  CCL subjected all consumers who spoke with a CCL telemarketer to

aggressive CCL sales pitches designed to induce consumers to purchase vacation upgrades, such as hotels, rental cars, extended stays, excursions, etc., that could result in significant additional charges (and profit for CCL).

### The PACs

65.     Economic Strategy and deJongh contacted PACs that might be interested in conducting political survey robocalls.  DeJongh offered to make millions of free survey robocalls for these PACs.  In return, he requested that the PACs allow him to add a pitch at the beginning and end of the robocalls notifying consumers that if they completed the survey, they would be eligible for a "free" three-day/two-night cruise to the Bahamas provided by CCL.  Most PACs agreed to include this message on the robocalls.

### The Scripts

66.     The PACs typically provided the survey questions that they wanted to have asked, and deJongh reviewed them.  DeJongh and Birkett then blasted the surveys to consumers using robocalls.  In some instances, however, deJongh and Birkett wrote their own survey questions for the robocalls.  These "homegrown" survey robocalls also included the "free" cruise pitch.

67.     CCL had access to the survey scripts, by virtue of a website "portal" that CCL requested deJongh install on his corporate website that allowed CCL, using a username and password, to review scripts, contracts, recordings and corporate emails.

### The Consumer Phone Numbers

68.     DeJongh secured a list of consumer phone numbers for the entire United States and provided those numbers to TSOA International ("TSOA") to use in the calling campaigns.  TSOA hosted a web-based dialing platform that could "blast" out an enormous volume of robocalls each day.

69.     The calling list deJongh purchased included more than one hundred million phone numbers.  The Cruise Call Telemarketers did not scrub the list against the National Do Not Call Registry.

### The Caller ID Names and Numbers

70.     Economic Strategy and LSS blasted the robocalls with approximately 100 different Caller ID phone numbers, most of which were provided by the TMC Enterprise.

71.     Economic Strategy and LSS shared responsibility for inputting the desired Caller ID Number into TSOA's robodialer to transmit with the robocalls.

72.     Using additional services provided by the TMC Enterprise, Economic Strategy and LSS assigned many of the cruise robocalls with a Caller ID name – "IND SUR GROUP" – that did not identify any of the entities making the calls.

### The Dialer

73.     Both Economic Strategy and LSS accessed TSOA's web-based dialing platform to start and stop robocalling campaigns.  TSOA billed Economic Strategy for the costs of the dialing and Economic Strategy relayed those costs to LSS.  LSS would, in turn, remit funds to deJongh to cover the costs of the robocalling.

### The Calls

74.     The following chart shows the five steps involved in making the cruise calls and funneling the money generated by the calls between the various Cruise Call Telemarketers:



THE PATH OF THE CRUISE CALL AND RESULTING PAYMENTS

75.     The cruise call lead generation campaign was successful.  CCL estimates it received approximately 20,000 inbound transfers from the calls each week, requiring CCL to add call center representatives to handle the increased call volume.

76.     Over a period of only ten months, CCL paid deJongh, Birkett and Broomfield between $1,000,000 to $2,000,000 for the inbound transfer leads.

77.     Birkett, Broomfield and deJongh finally stopped the lead generation robocalling campaign in July or August 2012 because, as deJongh testified, "there was [sic] a ton of complaints."  Investigational Hearing of Jacob deJongh at 215.  The calls also led to a flurry of lawsuits from angry consumers, including a putative class action lawsuit, *Birchmeier v. Caribbean Cruise Line, Inc.*, No. 1:12-cv-4069 (N.D. Ill.).

**The Cruise Call Defendants Violated the Telemarketing Sales Rule**

78.     In numerous instances, LSS and Economic Strategy made telemarketing calls on behalf of CCL: (1) to numbers listed on the National Do Not Call Registry, in violation of 16 C.F.R. § 310.4(b)(1)(iii)(B); (2) to people who had previously requested that CCL no longer call them, in violation of 16 C.F.R. § 310.4(b)(1)(iii)(A); (3) that delivered a prerecorded message, in violation of 16 C.F.R. § 310.4(b)(1)(v); and (4) that failed to transmit or cause to be transmitted the name of the telemarketer or seller, in violation of 16 C.F.R. § 310.4(a)(8).

79.     CCL is a "seller" and "telemarketer" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2.

80.     LSS, Economic Strategy, Broomfield, Birkett and deJongh are "telemarketers" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2.

81.     CCL is a seller and telemarketer of goods or services (including cruise vacations) to consumers.  CCL has caused telemarketers (including LSS, Economic Strategy, Broomfield, Birkett and deJongh) to call consumers to induce the purchase of goods or services from CCL.

82.     CCL also operates its own telemarketing rooms that call consumers to induce them to purchase goods or services from CCL.

83.     LSS, Economic Strategy, Broomfield, Birkett and deJongh are telemarketers that initiated outbound telephone calls to consumers in the United States to induce the purchase of goods or services provided by CCL.

84.     The Cruise Call Defendants have engaged in telemarketing by a plan, program, or campaign conducted to induce the purchase of goods or services by use of one or more telephones and which involves more than one interstate telephone call.  Specifically, the Cruise Call Defendants made phone calls marketing cruise vacations to consumers.

85.     At all times relevant to this Complaint, the Cruise Call Defendants have maintained a substantial course of trade or business in the offering for sale and sale of goods or services via the telephone, in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

86.     To induce the purchase of their goods or services, the Cruise Call Defendants caused LSS, Economic Strategy, Broomfield, Birkett and deJongh to initiate telephone calls to telephone numbers on the National Do Not Call Registry.

87.     To induce the purchase of their goods or services, the Cruise Call Defendants caused LSS, Economic Strategy, Broomfield, Birkett and deJongh to initiate telephone calls to the telephone numbers of consumers who have previously stated that they did not wish to receive calls by or on behalf of CCL.

88.     In the course of the telemarketing described above, the Cruise Call Defendants did not transmit or cause to be transmitted to caller identification services the name of the telemarketer making the call, or the name of CCL.

89.     In the course of the telemarketing described above, since September 1, 2009, the Cruise Call Defendants have made outbound telephone calls that deliver prerecorded messages offering CCL's goods or services to persons who have not signed an express agreement, in writing, that authorizes delivery of prerecorded messages by or on behalf of CCL.

## THE PACIFIC TELECOM DEFENDANTS' BUSINESS ACTIVITIES

### The Pacific Telecom Defendants Assisted and Facilitated Billions of Illegal Calls, Including the Cruise Call Telemarketers' Robocalls

90.     The Pacific Telecom Defendants, including the TMC Enterprise, assisted telemarketers, including the Cruise Call Telemarketers, in four ways: (1) making it possible for clients to spoof their Caller ID Numbers by providing clients with phone numbers to use for

Caller ID Number purposes; (2) providing the means by which those clients could assign (and change at will) the Caller ID Name ("CNAM") that would be associated with a particular telephone number; (3) funding part of the robocalling campaigns by paying clients a portion of the "dip fees" generated by their telemarketing activities; and (4) hiding clients' identities when responding to law enforcement subpoenas and civil investigative demands requesting such information.

### *Caller ID Information*

91.      The following graphic of a generic consumer Caller ID box demonstrates how typical consumers experience Caller ID Numbers and CNAMs on their home phones:



*Caller ID Number*

92.      Pacific Telecom owned thousands of phone numbers that it leased initially to the TMC Enterprise, which then leased and subleased those phone numbers to telemarketing operations to use as Caller ID Numbers for telemarketing calls.

93.      Economic Strategy, for example, leased dozens of telephone numbers from the TMC Enterprise that it then used for its cruise call telemarketing.

94.     The TMC Enterprise provided these numbers to telemarketers, including Economic Strategy, at no cost, instead earning profits by retaining a portion of the "dip fees," discussed below.

95.     By providing telephone numbers, the Pacific Telecom Defendants, including the TMC Enterprise, assisted and facilitated telemarketers, including the Cruise Call Telemarketers, in two important ways.

96.     *First*, it allowed telemarketers to spread their calls over dozens of different Caller ID Numbers, thus limiting consumers' ability to block the calls using call blocking technology and reducing law enforcement scrutiny by lowering the total complaint volumes for each individual Caller ID Number.  Many telephone carriers permit their customers to block calls from a limited number of Caller ID Numbers.  Customers can typically block no more than 5-20 Caller ID Numbers at a time, depending on the carrier.  When a telemarketer spreads their calls over dozens of different Caller ID Numbers, consumers lose the ability to block effectively Caller ID Numbers from that telemarketer.  Moreover, law enforcement analyzes complaint data tied to each Caller ID Number.  When telemarketers have no-cost access to an enormous supply of different Caller ID Numbers, it becomes much more difficult for law enforcement to analyze the true impact of a particular calling campaign because the complaint information is spread across dozens of disparate Caller ID Numbers.

97.     *Second*, by having access to a large volume of duly assigned telephone numbers, telemarketers were able to take advantage of CNAM services and the resulting CNAM dip fees, described below.

98.     Telephone numbers assigned to Pacific Telecom generated more than one million Do Not Call complaints between April 2010 and October 2012.

### *CNAM*

99.     The TMC Enterprise also provided a Caller ID management website that allowed telemarketers to assign a CNAM – a Caller ID Name – to each Caller ID Number they leased from the enterprise.  Moreover, telemarketers could use the Caller ID management website to change the CNAM as often as they wanted, allowing them to easily manipulate the data that appeared on a consumer's Caller ID display.  This made it more difficult for consumers to identify the source of an abusive call, and also made it harder for consumers to screen calls because the name of the caller could change from one call to the next.

100.     Using the TMC Enterprise Caller ID management website, the Cruise Call Telemarketers were able to transmit the inaccurate and generic CNAM "IND SUR GROUP."

101.     In addition to providing Caller ID numbers and CNAM services to the Cruise Call telemarketers, the TMC Enterprise also provided such services to many other clients, including the defendants in *United States v. Cox*, No. 8:11-cv-01910 (C.D. Cal.).  The Department of Justice, acting on behalf of the Commission, filed the *Cox* complaint in December 2011.  The defendants in the *Cox* litigation included six telemarketing companies that, beginning in 2007, made millions of illegal robocalls, transmitted false Caller ID information and called numbers on the National Do Not Call Registry, using Caller ID Numbers leased from the TMC Enterprise. The *Cox* telemarketing calls marketed, among other products and services, credit card interest rate reduction programs, extended automobile warranties and home security systems.  The *Cox* defendants used various generic or inaccurate CNAMs, including "CARD SERVICES," "CREDIT SERVICES" and "PRIVATE OFFICE."  In February 2013, the parties entered into a stipulated final order that imposes on the *Cox* defendants a lifetime telemarketing ban and a suspended $1.1 million civil penalty.

102.     The TMC Enterprise also provided Caller ID Numbers and CNAM services to the defendants in *United States v. JGRD, Inc.*, No. 2:12-cv-00945 (E.D. Pa.).  The Department of Justice, acting on behalf of the Commission, filed the *JGRD* complaint in February 2012.  The *JGRD* telemarketing calls marketed auto warranties, carpet cleaning services, travel services, debt consolidation and mortgage services, and other services using illegal robocalls.  Beginning in 2008, the *JGRD* defendants used various generic or inaccurate CNAMs, including "CUSTOMERSVC," "CUST SERVICE," "SERVICE," "SERVICE ANNOUNC" and "INSURANCECO."  At the time of filing the complaint, the parties agreed to a stipulated final order that imposes on the *JGRD* defendants a $1 million civil penalty, suspended after payment of $10,000.

### *CNAM Dip Fees*

103.     When a receiving party's carrier looks up a Caller ID Number in a CNAM Database, that carrier must pay a small fee (a "dip fee") to the database as a cost of accessing the database.  The CNAM databases often send a portion of the dip fee back to the company that owns the originating phone number.

104.     In order to entice clients to lease numbers, the TMC Enterprise paid its clients a portion of the dip fees (a fraction of a cent per call) it received from the CNAM databases.  The TMC Enterprise's telemarketing clients made millions of calls a day, so the dip fees added up quickly.

105.     The TMC Enterprise paid Economic Strategy over $135,000 in CNAM dip fees over a period of only four months.

106.     By redirecting some of these fees back to the client, the TMC Enterprise provided telemarketers with a reliable income stream that helped fund robocalling campaigns.

*TMCE's Role in the Cruise Calls*

107. The following chart illustrates in twelve steps how the TMC Enterprise assisted one of its clients, Economic Strategy, in: (1) obtaining Caller ID Numbers for the cruise calls, (2) assigning CNAMs to the Caller ID Numbers, (3) and profiting from CNAM dips generated by the calls:

**TMCE'S ROLE IN THE CRUISE CALLS**

(START AT STEP 1 ON LEFT SIDE OF GRAPHIC)



*Hiding Clients from Law Enforcement*

108.    In numerous instances, the TMC Enterprise refused to identify its clients in response to law enforcement subpoenas and civil investigative demands requiring the production of such information.

109.    For instance, in response to civil investigative demands from the Commission requiring the TMC Enterprise to identify the clients assigned Caller ID Numbers used by the Cruise Call Telemarketers, the TMC Enterprise failed to identify the end user of the Caller ID Numbers.  The TMC Enterprise failed to provide this information, even though the TMC Enterprise assigned many of the Caller ID Numbers at issue in the civil investigative demands to Economic Strategy prior to responding to the civil investigative demands.

110.    By refusing to provide information about its clients in response to law enforcement subpoenas and civil investigative demands, the TMC Enterprise helped its clients avoid law enforcement scrutiny and enforcement actions for violation of state and federal telemarketing laws.

**The Pacific Telecom Defendants Knew
That Their Clients Were Violating the TSR**

111.    Accuardi and Hamilton knew that their clients were violating the TSR.  They had an employee – David Nelson – whose sole responsibility was responding to consumer complaints and subpoenas directed to the TMC Enterprise.  The TMC Enterprise received a large volume of consumer complaints because consumers who researched Caller ID Numbers making unwanted calls could determine, after some internet investigation, that Pacific Telecom owned the Caller ID Number in question.

112.    Consumer complaints flowed into the TMC Enterprise's offices on a daily basis. Fred Accuardi was personally aware that the TMC Enterprise received between 15 and 20

consumer complaints per day about calls with Caller IDs assigned by the TMC Enterprise to their clients.

113.    These complaints included Do Not Call complaints and robocall complaints.  In addition, the TMC Enterprise received an average of two to three law enforcement or regulatory subpoenas per day seeking information about the TMC Enterprise's clients.

114.    In addition to the knowledge of consumer complaints about Caller ID Numbers leased from the TMC Enterprise, the TMC Enterprise was also aware that Economic Strategy made "survey" calls that tried to sell cruise vacations to consumers.

115.    The TMC Enterprise received complaints about the Economic Strategy calls and learned that consumers were receiving robocalls with political messages that would also try to sell a cruise vacation.

116.    The TMC Enterprise, however, continued to provide Caller ID Numbers and CNAM services to the Cruise Call Telemarketers until the campaign ended in July or August 2012.  The TMC Enterprise also provided CNAM dip fees, which continued to roll in for months after the calls stopped, to the Cruise Call Telemarketers through October 2012.

117.    As noted previously, other clients of the TMC Enterprise used its Caller ID management website to transmit inaccurate CNAMs, such as "IND SUR GROUP," "CARD SERVICES," "CREDIT SERVICES," "PRIVATE OFFICE," "CUSTOMERSVC," "CUST SERVICE," "SERVICE," "SERVICE ANNOUNC" and "INSURANCECO."  The TMC Enterprise had access to its Caller ID management website and reviewed CNAMs used by its clients.

**The Pacific Telecom Defendants Violated the Telemarketing Sales Rule**

118.    The Pacific Telecom Defendants, including the TMC Enterprise, have provided substantial assistance or support to "seller[s]" and "telemarketer[s]" engaged in "telemarketing," as defined by the TSR, 16 C.F.R. § 310.2.

119.    In numerous instances, the TMC Enterprise's clients made telemarketing calls using Pacific Telecom telephone numbers that transmitted or caused to be transmitted CNAMs that did not name the telemarketer or seller on whose behalf the TMC Enterprise's clients were making the telephone call.

120.    The Pacific Telecom Defendants, including the TMC Enterprise, knew the identity of the telemarketers with which they contracted, had access to the database that associated the names and numbers used by the Cruise Call Telemarketers and other TMC Enterprise telemarketer clients, and reviewed that database to identify CNAMs used by their clients.

121.    Using the TMC Enterprises' Caller ID management website, telemarketers were able to blast robocalls using CNAMs that failed to identify the telemarketer or seller placing the call – CNAMs such as "IND SUR GROUP," "CARD SERVICES," "CREDIT SERVICES" and "PRIVATE OFFICE."

122.    The Pacific Telecom Defendants, including the TMC Enterprise, knew, or consciously avoided knowing, of instances in which the Caller ID Numbers or CNAMs did not accurately reflect the identity of the telemarketer or seller making the call.

123.    In numerous instances, the Cruise Call Telemarketers and other TMC Enterprise clients made outbound calls to induce the sale of goods or services to numbers listed on the National Do Not Call Registry.

124.    The Pacific Telecom Defendants, including the TMC Enterprise, knew, or consciously avoided knowing, that the Cruise Call Telemarketers and other TMC Enterprises clients were making such calls.

125.    In numerous instances since September 1, 2009, the Cruise Call Telemarketers and other TMC Enterprise clients made outbound calls that delivered prerecorded messages to induce the sale of goods or services when the persons to whom these telephone calls were made had not expressly agreed, in writing, to authorize the seller to place prerecorded calls to such person.

126.    The Pacific Telecom Defendants, including the TMC Enterprise, knew, or consciously avoided knowing, that the Cruise Call Telemarketers and other TMC Enterprise clients were making such calls.

127.    Beginning in 2007, though October 2012, Defendants Accuardi and TMC provided substantial assistance and support to their clients, by, among other things, engaging in the conduct set forth herein, even though Accuardi and TMC knew, or consciously avoided knowing, that the Cruise Call Telemarketers and other TMC Enterprise clients were engaged in violations of Section 310.4 of the TSR.

128.    Between September 2008 and September 2011, Defendant T M Caller ID provided substantial assistance and support to its clients, by, among other things, engaging in the conduct set forth herein, even though T M Caller ID knew, or consciously avoided knowing, that the Cruise Call Telemarketers and other TMC Enterprise clients were engaged in violations of Section 310.4 of the TSR.

129.    In addition, beginning July 2011 through October 2012, Defendants ITC and IT, LLC provided substantial assistance and support to their clients, by, among other things,

engaging in the conduct set forth herein, even though ITC and IT, LLC knew, or consciously avoided knowing, that the Cruise Call Telemarketers and other TMC Enterprise clients were engaged in violations of Section 310.4 of the TSR.

130.   Finally, beginning July 15, 2011 through October 2012, Defendants Hamilton and Pacific Telecom provided substantial assistance and support to their clients, by, among other things, engaging in the conduct set forth herein, even though Hamilton and Pacific Telecom knew, or consciously avoided knowing, that the Cruise Call Telemarketers and other TMC Enterprise clients were engaged in violations of Section 310.4 of the TSR.

## COUNT I – THE CRUISE CALL DEFENDANTS
### Violating the National Do Not Call Registry

131.   In numerous instances, in connection with telemarketing, the Cruise Call Defendants initiated or caused others to initiate an outbound telephone call to a person's telephone number on the National Do Not Call Registry, in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

## COUNT II – THE CRUISE CALL DEFENDANTS
### Ignoring Entity-Specific Do Not Call Requests

132.   In numerous instances, in connection with telemarketing, the Cruise Call Defendants initiated or caused others to initiate an outbound telephone call to a person who had previously stated that he or she did not wish to receive such a call made by or on behalf of the seller whose goods or services were being offered in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(A).

## COUNT III – THE CRUISE CALL DEFENDANTS
### Failure To Transmit Caller ID

133.   In numerous instances, in connection with telemarketing, the Cruise Call Defendants have failed to transmit or have caused telemarketers to fail to transmit the name of

the telemarketer or of the seller to any caller identification service in use by a recipient of a

telemarketing call, in violation of the TSR, 16 C.F.R. § 310.4(a)(8).

### COUNT IV – THE CRUISE CALL DEFENDANTS
### Initiating Unlawful Prerecorded Messages

134.    In numerous instances on or after September 1, 2009, in connection with

telemarketing, the Cruise Call Defendants made or caused others to make outbound telephone

calls that delivered prerecorded messages to induce the purchase of goods or services in violation

of the TSR, 16 C.F.R. § 310.4(b)(1)(v).

### COUNT V – THE PACIFIC TELECOM DEFENDANTS
### Assisting and Facilitating Abusive Telemarketing Acts or Practices
### in Violation of the Telemarketing Sales Rule

135.    In numerous instances, the Pacific Telecom Defendants have provided substantial

assistance or support, as described in Paragraphs 70 through 72 and 90 through 130, to sellers or

telemarketers whom the Pacific Telecom Defendants knew or consciously avoided knowing

were engaged in conduct that violated § 310.4 of the TSR.

136.    The Pacific Telecom Defendants' substantial assistance or support as alleged in

Paragraph 135 above violates the TSR, 16 C.F.R. § 310.3(b).

### COUNT VI - ALL DEFENDANTS
### Violating Florida's Deceptive and Unfair Trade Practices Act
### (*Per Se* Violations of FDUTPA)

137.    Plaintiffs adopt, incorporate herein and re-allege Paragraphs 1 through 130 as if

fully set forth hereinafter.

138.    Defendants, at all times material hereto, provided goods or services as defined

within Section 501.203(8), Florida Statutes.

139.    Defendants, at all times material hereto, solicited consumers within the definition

of Section 501.203(7), Florida Statutes.

140.     Defendants, at all times material hereto, were engaged in trade or commerce within the definition of Section 501.203(8), Florida Statutes.

141.     Defendant CCL is a Florida corporation and Defendants LSS and Economic Strategy are Florida limited liability companies.  Defendant CCL has a place of business in this District.

142.     The remainder of the entities named as Defendants, the TMC Enterprise, operated as a common enterprise and engaged in the deceptive acts and practices described herein.

143.     Further, at all times material hereto, the natural persons named as Defendants knew of and controlled or had the authority to control the activities of the entities named as Defendants and/or other unnamed entities.

144.     The natural persons named as Defendants participated directly or indirectly in the unfair or deceptive acts and practices of the Defendants and/or other unnamed entities.

145.     Florida Statutes Section 501.203(3) establishes that a violation of FDUTPA may be based upon a violation any of the following: (a) any rules promulgated pursuant to the Federal Trade Commission Act; (b) the standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts; or (c) any law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

146.     As demonstrated above, Defendants knowingly made or allowed to be made telephonic sales calls which violated numerous provisions of the TSR including telephone solicitation,

     a.     to numbers listed on the National Do Not Call Registry, in violation of 16 C.F.R. § 310.4(b)(1)(iii)(B);

b.      to people who had previously requested that CCL no longer call them, in violation of 16 C.F.R. § 310.4(b)(1)(iii)(A);

c.      that failed to transmit or cause to be transmitted the name of the telemarketer or seller, in violation of 16 C.F.R. § 310.4(a)(8); and

d.      that delivered a prerecorded message, in violation of 16 C.F.R. § 310.4(b)(1)(v).

147.    Pursuant to Section 501.203(3)(a), Florida Statutes, Defendants' violations of the TSR constitute *per se* violations of the provisions of Chapter 501, Part II of the Florida Statutes.

148.    As a result of the foregoing, Defendants have engaged in deceptive or unfair acts or practices in violation of FDUTPA.

## COUNT VII - THE CRUISE CALL DEFENDANTS
### Violating North Carolina Statutes

149.    Plaintiffs adopt, incorporate herein and re-allege Paragraphs 1 through 130 as if fully set forth hereinafter.

150.    In numerous instances, the Cruise Call Defendants' above alleged acts and omissions, when directed to North Carolina telephone service subscribers, violated specific provisions of the North Carolina Telephone Solicitations Act, N.C. Gen. Stat. §75-100, *et seq*., including:

a.      Initiating or causing others to initiate outbound telephone solicitation calls to persons' telephone numbers on the National Do Not Call Registry, which is prohibited by N.C. Gen. Stat. § 75-102(a);

b.      Initiating or causing others to initiate outbound telephone calls to persons who had previously stated that they did not wish to receive such a call made by or on

behalf of the seller whose goods or services were being offered, which  is prohibited by N.C. Gen. Stat. § 75-102(b);

      c.      Employing or allowing others to employ any method that thwarts a telephone service subscriber's use of caller identification services available on their phones, which is prohibited by N.C. Gen. Stat. § 75-102(i); and

      d.      Initiating, whether for telephone solicitation purposes or for any other purpose, unsolicited recorded phone messages, which is prohibited by N.C. Gen. Stat. § 75-104(a).

### COUNT VIII - THE PACIFIC TELECOM DEFENDANTS
### Violating North Carolina Statutes

151.    Plaintiffs adopt, incorporate herein and re-allege Paragraphs 1 through 130 as if fully set forth hereinafter.

152.    In numerous instances, the Pacific Telecom Defendants have provided substantial assistance or support, as described in Paragraphs 70 through 72 and 90 through 130, to sellers or telemarketers whom they knew or consciously avoided knowing were engaged in violations of § 310.4 of the TSR and the North Carolina Telephone Solicitors Act, N.C. Gen. Stat. § 75-100, *et seq*.

153.    The Pacific Telecom Defendants' substantial assistance or support as alleged in Paragraph 152 violates the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.*

## CONSUMER INJURY

154.     Consumers have suffered and will continue to suffer substantial injury as a result of (a) the Cruise Call Defendants' violations of the TSR; and (b) the Pacific Telecom Defendants' assisting and facilitating their clients in violations of the TSR.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

155.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and other ancillary relief to prevent and remedy any violation of any provision of law enforced by the Commission.

156.     Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d) (2009) and by 74 Fed. Reg. 857 (Jan. 9, 2009) (to be codified at 16 C.F.R. § 1.98(d)), authorizes this Court to award monetary civil penalties of up to $11,000 for each violation of the TSR on or before February 9, 2009, and up to $16,000 for each violation of the TSR committed after February 9, 2009.  Defendants' violations of the TSR were committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

157.     This Court, in the exercise of its equitable jurisdiction, may award ancillary relief including disgorgement and damages to remedy injury caused by Defendants' violations of the TSR and the FTC Act.

158.     Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court

finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR,

including the rescission or reformation of contracts, and the refund of money.

159.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow

Plaintiff, the State of Florida, to enforce its state law claims under FDUTPA against Defendants

in this Court. To ensure compliance and remedy violations of FDUTPA, Sections 501.207(1) and

501.207(3), Fla. Stat., authorize the Court to enjoin any person who has violated, is violating, or

is otherwise likely to violate FDUTPA, and award civil penalties, costs and further equitable

relief as appropriate.

160.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow

Plaintiff, the State of North Carolina, to enforce its state law claims under the North Carolina

Telephone Solicitations Act and the North Carolina Unfair and Deceptive Trade Practices Act,

N.C. Gen. Stat. §§ 75-1.1, *et seq.*, and N.C. Gen. Stat. § 75-100, *et seq.*, respectively, against

Defendants in this Court.  To ensure compliance and remedy violations of the aforesaid North

Carolina Statutes, N.C. Gen. Stat. §§ 75-14 through 15.2 and 105(a) authorize the Court to award

temporary, preliminary, and permanent injunctive relief, civil penalties, costs and attorneys' fees.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that this Court, as authorized by Section 13(b) of the FTC

Act, 15 U.S.C. §§ 53(b), FDUTPA, N.C. Gen. Stat. §§ 75-14 through 15.2 and 105(a), and

pursuant to its own equitable powers:

A.    Award Plaintiffs such preliminary injunctive and ancillary relief as may be

necessary to avert the likelihood of ongoing law violations during the pendency of this

action, including, but not limited to, temporary and preliminary injunctions;

B.      Enter judgment against Defendants and in favor of Plaintiffs for each

violation alleged in this Complaint;

C.      Award Plaintiffs monetary civil penalties from each Defendant for every

violation of the TSR, and FDUTPA;

D.      Enter a permanent injunction to prevent future violations of the TSR, the

FTC Act, and FDUTPA by Defendants;

E.      Order Defendants to pay the costs of this action; and

F.      Award Plaintiffs such other and additional relief, including disgorgement

and/or damages as the Court may determine to be just and proper.

Dated: May 18, 2015                              Respectfully submitted,

                                                 **FOR THE FEDERAL TRADE COMMISSION**

                                                 JONATHAN E. NUECHTERLEIN
                                                 General Counsel


                                                 /s/ Bikram Bandy
                                                 Emily Cope Burton, Special Bar No. A5502042
                                                 Bikram Bandy, Special Bar No. A5501814
                                                 Federal Trade Commission
                                                 600 Pennsylvania Ave. NW, Mail Stop CC-8528
                                                 Washington, DC 20580
                                                 (202) 326-2728; eburton@ftc.gov
                                                 (202) 326-2978; bbandy@ftc.gov

**FOR THE STATE OF COLORADO**

CYNTHIA H. COFFMAN
Attorney General


 /s/ Devin Laiho
Devin Laiho
Assistant Attorney General
Consumer Protection
Attorneys for State of Colorado
Ralph L. Carr Colorado Judicial Center
1300 Broadway, Seventh Floor
Denver, CO 80203
(720) 508-6219 (Telephone)
Devin.Laiho@state.co.us

**FOR THE STATE OF INDIANA**

GREGORY F. ZOELLER
Indiana Attorney General


 /s/ Marguerite M. Sweeney
MARGUERITE M. SWEENEY #2052-49
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., 5th Floor
Indiana Government Center South
Indianapolis, IN 46204
Telephone 317.232.1011
Facsimile 317.232.7979
 marguerite.sweeney@atg.in.gov

**FOR THE STATE OF FLORIDA**

PAMELA JO BONDI
Attorney General


 /s/ Katherine A. Kiziah
Katherine A. Kiziah
Assistant Attorney General
Florida Bar No. 0017585
1515 North Flagler Dr., Suite 900
West Palm Beach, FL 33401
(561) 837-5000 (Telephone)
(561) 837-5109 (Fax)
katherine.kiziah@myfloridalegal.com

**FOR THE STATE OF KANSAS**

DEREK SCHMIDT
Kansas Attorney General


 /s/ Meghan E. Stoppel
Meghan E. Stoppel
Assistant Attorney General
Office of the Kansas Attorney General
KS S.Ct. No. #23685
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612
(785) 296-3751 (Telephone)
Meghan.Stoppel@ag.ks.gov

**FOR THE STATE OF MISSISSIPPI**

Mississippi Public Service Commission
BY JIM HOOD
Mississippi Attorney General


 /s/ Frank Farmer
Frank Farmer
Special Assistant Attorney General
Office of the Mississippi Attorney General
Post Office Box 1174
Jackson, MS 39215-1174
(601) 961-5821 (Telephone)
(601) 961-5469 (Fax)
Frank.Farmer@psc.state.ms.us

**FOR THE STATE OF NORTH CAROLINA**

ROY COOPER
North Carolina Attorney General


 /s/ David N. Kirkman
David N. Kirkman, NC Bar No. 8858
Special Deputy Attorney General
Consumer Protection Division
North Carolina Department of Justice
114 West Edenton Street
P.O. Box 629
Raleigh, NC 27602-0629
(919) 716-6033 (Telephone)
(919) 716-6050 (Fax)
dkirkman@ncdoj.gov

**FOR THE STATE OF MISSOURI**

CHRIS KOSTER
Missouri Attorney General


/s/ Mary D. Morris
Mary D. Morris, Mo. Bar # 60921
Assistant Attorney General
P.O. Box 861
St. Louis, MO 63188
(314) 340-6816 (Telephone)
(314) 340-7981 (Fax)
Mary.Morris@ago.mo.gov

**FOR THE STATE OF OHIO**

MICHAEL DEWINE
Ohio Attorney General


 /s/ Megan E. McNulty
Megan E. McNulty (0078391)
Associate Assistant Attorney General
Consumer Protection Section
Office of Ohio Attorney General Michael DeWine
One Government Center, Suite 1340
Toledo, OH 43604
(419) 245-2550 (Telephone)
(877) 588-5480 (Fax)
megan.mcnulty@ohioattorneygeneral.gov

**FOR THE STATE OF TENNESSEE**

/s/ Shiva K. Bozarth
Shiva K. Bozarth, BPR No.22685
Chief of Compliance
Tennessee Regulatory Authority
502 Deadrick Street, 4th Floor
Nashville, Tennessee 37243

**FOR THE STATE OF WASHINGTON**

ROBERT W. FERGUSON
Attorney General

/s/ Sarah Shifley
SARAH SHIFLEY, WSBA #39394
Assistant Attorney General
Consumer Protection Division
Washington State Attorney General's Office
800 Fifth Ave., Ste. 2000
Seattle, WA 98104
(206) 389-3974
sarah.shifley@atg.wa.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2015, I electronically filed the foregoing document with

the Clerk of the Court and served on the following as indicated:

**VIA CM/ECF:**
F. Antone Accuardi, Esq.
64783 E. Lupine Dr.
Brightwood, Oregon 97049
Interlaw@justice.com
*Counsel for Defendants*
*Pacific Telecom Communications*
*Group, International Telephone*
*Corporation, International Telephone,*
*LLC, Telephone Management*
*Corporation, T M Caller ID, LLC, and*
*Fred Accuardi*

**VIA ELECTRONIC MAIL:**
Richard Epstein, Esq.
Jeffrey A. Backman, Esq.
200 East Broward Boulevard, Suite 1800
Fort Lauderdale, FL  33301
richard.epstein@gmlaw.com
jeffrey.backman@gmlaw.com
*Counsel for Defendants Caribbean*
*Cruise Line, Inc.*

**VIA ELECTRONIC MAIL:**
Steve Hamilton
3721 Ocean View Ave.
Los Angeles, CA  90066
*Individually*

**VIA ELECTRONIC MAIL:**
Mitchell N. Roth, Esq.
Roth Doner Jackson, PLC
8200 Greensboro Drive, Suite 820
McLean, Virginia 22102
mroth@rothdonerjackson.com
*Counsel for Linked Service Solutions, LLC,*
*Economic Strategy, LLC, Jason Birkett,*
*Scott Broomfield, and Jacob deJongh*


/s/ Bikram Bandy
Bikram Bandy