THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No.: <u>0:15-cv-60423 WJZ</u>

FEDERAL TRADE COMMISSION,

STATE OF COLORADO,

STATE OF FLORIDA,

STATE OF INDIANA,

STATE OF KANSAS,

STATE OF MISSISSIPPI,

STATE OF MISSOURI,

STATE OF NORTH CAROLINA,

STATE OF OHIO,

STATE OF TENNESSEE, and

STATE OF WASHINGTON,

               Plaintiffs.

                   vs.

CARIBBEAN CRUISE LINES, INC., a
Florida corporation,

LINKED SERVICES SOLUTIONS, INC., A
Florida limited liability company,

ECONOMIC STRATEGY, LLC, a Florida
limited liability company,

PACIFIC TELECOM COMMUNICATIONS
GROUP, INC., a Nevada Corporation,

INTERNATIONAL TELEPHONE
CORPORATION, a Belize International
Business Corporation,

_____/

INTERNATIONAL TELEPHONE, LLC, a
Wyoming Limited Liability Company,

TELEPHONE MANAGEMENT
CORPORATION, an Oregon Corporation,

TMCALLERID, an Oregon Limited Liability
Company,

SCOTT BROOMFIELD, individually, and as
an office, director, or owner of Linked Service
Solutions, LLC,

JASON BIRKETT, individually and as an
officer, director or owner of Linked Service
Solutions, LLC,

JACOM DEJONGH, individually and as an
officer, director or owner of Economic
Strategy, LLC,

 FRED ACCUARDI, individually and as
officer director or owner of Pacific Telecom
Communications Group, International
Telephone Corporation, International
Telephone, LLC, Telephone Management
Corporation, and T M Caller ID, LLC, and

STEVE HAMILTON, individually and as an
officer, director or owner of Pacific Telecom
Communications Group,

_____ Defendants. _____/

DEFENDANTS PACIFIC TELECOM COMMUNICATIONS GROUP, INC., TELEPHONE

MANAGEMENT CORPORATION, ITC, ITC, LLC, TMCallerID, and FRED ACCUARDI'S

ANSWER,  AFFIRMATIVE DEFENSES and COUNTERCLAIMS


**JURY TRIAL DEMANDED**

**THREE JUDGE  DISTRICT  PANEL REQUESTED**

1.      NOW COMES DEFENDANTS Pacific Telecom Communications Group, Inc. ("PTCG"), and Telephone Management Corporation ("TMC"), collectively, "Defendants"  by and through the undersigned counsel who answer Plaintiffs complaint individually and not jointly as follows:

2.      As to the allegations in paragraphs 1-11, Defendants admit that the statutes speak for themselves, but deny that any of them have been violated by Defendants. Except as expressly admitted, Defendants deny each and every allegation in these paragraphs.

3.      As to the allegations in paragraphs 12-15, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in these paragraphs and on that basis deny each and every one.

4.      As to the allegations in  paragraph 16, Defendants deny each and every one of them.

5.      As to the allegations in paragraphs 17 and 18, Defendants deny each and every one of them.

6.      As to the allegations in paragraphs 19-29, Defendants admit that the statutes speak for themselves but deny that any of the statutes have been violated by Defendants. Except as expressly admitted, Defendants deny each and every allegation in these paragraphs.

7.      As to the allegations in paragraphs 30-32, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in these paragraphs and on that basis deny each and every one of them.

8.      As to the allegations in paragraph 33 Defendants admit that PTCG is a for profit corporation with its principal place of business located in Los Angeles, California, but deny each and every other allegation. Except as expressly admitted, Defendants deny each and every allegation in this paragraph.

9.    As to the allegations in paragraph 34, Defendants admit International Telephone Corporation is a foreign for profit corporation. Except as expressly admitted, Defendants deny each and every other allegation.

10.    As to the allegations in paragraph 35, Defendants admit that International Telephone, LLC is a for profit Wyoming corporation with its principal office located in Portland, Oregon but deny each and every other allegation.

11.    As to the allegations in paragraph 36, Defendants admit that TMCallerID is (was) a for profit corporation with its principal office located in Portland, Oregon but denies each and every allegation.

12.    As to the allegations in paragraph 37, Defendants admit the TMC is a for profit corporation with its principal office located at 2331 SW 5th Ave. Portland, Oregon, but deny each and every other allegation.

13.    As to the allegations in paragraphs 38-40, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in these paragraphs and on that basis deny each and every one.

14.    As to the allegations in paragraph 41, Defendants admit that Fred A. Accuardi is an owner of PTCG,  owner President of TMC and an owner manager of of IT, LLC and TMCallerID, and *was* a manager of ITC,  but deny each and every other allegation.

15.    As to the allegations in paragraph 42 Defendants admit that Steve Hamilton is an owner President of PTCG but deny each and every other allegation.

16.    As to the allegations in paragraph 43, Defendants admit.

17.    As to the allegations in paragraph 44, Defendants deny each and every one.

18.    As to the allegations in paragraph 45-46, Defendants deny each and every one.

19.      As to the allegations in paragraph 47, Defendants admit that the statute speaks for itself, but deny each and every other allegation.

20.      As to the allegations in paragraphs 48-62, Defendants admit that the statutes speak for themselves . With respect to paragraphs 57, and 60, Defendants specifically deny that any violations occurred. Defendants deny each and every other allegation. With respect to paragraph 61, the statute speaks for itself and informs Defendants that they may not be held liable by the statutes own language.

21.      As to the allegations in paragraph 61-69, Defendants lack sufficient knowledge or information sufficient to form a belief about the truth of the allegations and on that basis denies each and every one.

22.      As to the allegations in paragraph 70, Defendants deny each and every one.

23.      As to the allegations in paragraph 71, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations and on that basis denies each and every one.

24.      As to the allegations in paragraph 72, Defendants deny each and every one.

25.      As to the allegations in paragraph 73, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations and on that basis denies each and every one.

26.      As to the allegations in paragraph 74, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations and on that basis deny each and every one. Defendants further object to the graphical chart as vague and ambiguous, and as not in compliance with Fed. R. Civ. P. Rule 8.

27.      As to the allegations in paragraphs 75-76, Defendants lack  knowledge or information sufficient to form a belief about the truth of the allegations and on that basis deny each and every one.

28.     As to the allegations in paragraphs 77-82, Defendants admit that the case cited and the statutes speak for themselves but lack knowledge or information sufficient to form a belief about the truth of the allegations and on that basis deny each and every one.

29.     As to the allegations in paragraphs 83-89, Defendants admit that the statutes speak for themselves. As to the remaining allegations therein, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis deny each and every one.

30.     As to the allegations in paragraph 90, Defendants deny each and every one.

31.     As to the allegations in paragraph 91, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and on that basis deny each and every one. Defendants further object to the graphical chart as vague and ambiguous, and as not in compliance with Fed. R. Civ. P. Rule 8.

32.     As to the allegations in paragraph 92, PTCG admits that is was *assigned* thousands of phone numbers, but denies that it leased numbers to the alleged TMC enterprise, or that it leased numbers to telemarketers and denies every other allegation.

33.     As to the allegations in paragraphs 93-97, Defendants deny each and every one.

34.     As to the allegations in paragraph 98, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and on that basis deny each and every one.

35.     As to the allegations in paragraphs 99-102, Defendants deny each and every one.

36.     As to the allegations in paragraph 103, Defendants admit that approximately 1 in 3 calls generate a CNAM "dip" for which a small fee is paid. (One hundredth of a penny)

37.      As to the allegations in paragraph 104-106, Defendants deny each and every one.

38.      As to the allegation in paragraph 107, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegation and on that basis denies each and every one. Defendants further object to the graphical chart as vague, ambiguous and as not in compliance with Fed. R. Civ. P., Rule 8.

39.      As to the allegations in paragraph 108, Defendants deny each and every one.

40.      As to the allegations in paragraph 109, Defendants admit that they responded to civil investigative demands  requiring the alleged TMC enterprise to identify the "Clients" assigned various phone numbers but deny that the alleged TMC enterprise failed to provide this information, and deny that the TMC enterprise was required to "guess" what information that government was seeking. Not a single time did the government ask for the "end user".   Defendants admit that they assigned certain phone numbers to Economic Strategies but specifically deny that this information was not provided to the government.

41.      As to the allegations in paragraph 110, Defendants deny each and every one.

42.      As to the allegations in paragraphs 111-130, Defendants deny each and every one.

43.      As to the allegations in paragraphs 131-134, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations and on that basis deny each and every one.

44.      As to the allegations in paragraphs 135-136, Defendants deny each and every one.

45.      As to the allegations in paragraph 137-140, Defendants admit that the statute speaks for itself, but deny the remaining allegations.

46.      As to the allegation in paragraph 141, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation and on that basis denies each and every one.

47.     As to the allegations in paragraph 142, Defendants deny each and every one.

48.     As to the allegations in paragraph 143, Defendants deny each and every one.

49.     As to the allegations in paragraphs 144, Defendants deny each and every one.

50.     As to the allegations in paragraph 145-148, Defendants admit that the statutes speaks for themselves, but deny each and every allegation.

51.     As to the allegations in paragraphs 149-150, Defendants deny each and every one.

52.     As to the allegations in paragraphs 151-153, Defendants deny each and every one.

53.     As to the allegation in paragraphs 154-160, Defendants deny each and every one.

54.     As to the allegation in paragraphs 158-159, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis deny each and every one.

55.     As to the allegations in paragraphs 160, Defendants deny each and every one.


Defendants deny that the Plaintiffs, each and every one,  are entitled to any relief.


## DEFENDANTS AFFIRMATIVE DEFENSES

**Without waiving the foregoing or assuming the burden of proof with respect to its affirmative defenses, defendants alleges the following affirmative defenses.**


### FIRST AFFIRMATIVE DEFENSE

1.     The complaint fails to state a claim upon which relief can be granted.


### SECOND AFFIRMATIVE DEFENSE

2.     At all times relevant to the complaint, Defendant PTCG was an intra-LATA CLEC subject to regulation by Oregon, Washington, Montana, and North Dakota public service commission. Under the Federal Communications Act, 47 U.S.C. § 152(b), the regulation of the provisioning of facilities and

services by such intra-LATA and local carriers is presumptively subject to the primary jurisdiction of the respective state commissions in whose jurisdiction such a CLEC operates. Plaintiff's complaint seeks to apply federal law to regulate the use of utility facilities and services circumventing state jurisdiction in violation of 47 U.S.C. § 152(b). The Court should stay, or dismiss this action pending review by such Commission or review by the FCC in order to determine if the provision of phone numbers in the context of CNAM is "common carriage" and therefore exempt from the FTC enforcement powers, and states attorney generals not acting on recommendation from the states utility commissions. This court lacks subject matter jurisdiction.

## THIRD AFFIRMATIVE DEFENSE

3.      There are one or more complaints pending against PTCG in the Federal Communications Commission in which the same issue whether there has been and abuse or misuse of the this Defendants privileges as a telecommunications carrier. Under the terms of 47 U.S.C. §152(b), the court should stay or dismiss this action pending final resolution of these issues by such commission.

## FOURTH AFFIRMATIVE DEFENSE

4.      The issue of the propriety of PTCG's use of its facilities and privileges as a common carrier is subject to the primary jurisdiction of the Federal Communications Commission.

## FIFTH AFFIRMATIVE DEFENSE

5.      The Complaint seeks to regulate the terms and conditions under which a telephone common carrier may provide use of its services, facilities and privileges to members of the public and, as such, the complaint would not be within the subject matter jurisdiction of the state of Florida or the Federal Trade Commission or any other state attorney general plaintiffs.

## SIXTH AFFIRMATIVE DEFENSE

6.      As a common carrier PTCG is required to provide access to its services and facilities without

discrimination. Since none of the Defendants in fact makes any telemarketing or other prerecorded telephone broadcast calls, Plaintiff's complaint implicitly seeks to require Defendants , and its agents, to deny use of its telephone numbers (and its right of access to national calling number identifications databases) to customers based on improper, discriminatory criteria, including premature judgments concerning the (alleged) misuse or possible misuse of these facilities.

## SEVENTH AFFIRMATIVE DEFENSE

7.      Plaintiff and the purported class it seeks to represent gave their express prior consent to the receiving calls referenced in the Complaint.

## EIGHTH AFFIRMATIVE DEFENSE

8.      Some or all of the calls referenced in the Complaint were made to wireless numbers did not violate any of the referenced statutes because such calls were made within 15 days of the wireless number being ported from wire line service.

## NINTH AFFIRMATIVE DEFENSE

9.      Some or all of the calls referenced in the Complaint were made to wire line calls that were not on the Do Not Call List but were "call forwarded" to other phones that were on the Do Not Call List.

## TENTH AFFIRMATIVE DEFENSE

10.      Some or all of the calls referenced in the Complaint were made to any residential line using an artificial or prerecorded voice to deliver a message without prior written consent of the called party did not violate any of the referenced statutes because the call either (I) was made for emergency purposes; (ii) not made for a commercial purpose; (iii) was made for a commercial purpose but does not include or introduce an advertisement or constitute telemarketing; (iv) was made by or on behalf of a tax-exempt nonprofit organization; or (v) delivered a "healthcare" message made by or on behalf of, a

"covered entity" or its "business associate," as those terms dare defined in the HIPPA Privacy rule, 45 C.F.R. 160.103.

## ELEVENTH AFFIRMATIVE DEFENSE

11.     As a condition to the use of Defendant PTCG's telephone numbers, Defendants require clients to agree in writing to comply with all federal laws and regulations and provide clients with a detailed manual prepared by a former Federal Trade Commission staff attorney for the express purpose of assuring compliance with all governing federal regulations dealing with prerecorded calls and automated dialing.

## TWELFTH AFFIRMATIVE DEFENSE

12.     At all times relevant to the matters alleged in the Complaint, Defendants acted pursuant to legal advice of a former Federal Trade Commission staff attorney with respect to complying with governing federal regulations dealing with prerecorded calls. If Defendants violated any regulation, such violation was not made while knowing or consciously avoiding knowing that Defendants customers were violating any statutes. In fact, not a single CID or Subpoenas informed defendants that any violation had occurred, but rather, that some of its customers were being *investigated* for *possible* violations.

## THIRTEENTH AFFIRMATIVE DEFENSE

13.     To the extent that the FTC is purporting to bring this action of behalf of a class of persons, the proposed class does not meet the adequacy, typicality, commonality or numerosity requirements of Fed. R. Civ. P. Rule 23(a) or Rule 23(b).

## FOURTEENTH AFFIRMATIVE DEFENSE

14.     The merits of consumer complaints referenced in this Complaint as having been received by the FTC have not been investigated by the FTC. One or more of the Defendants have advised the FTC

of the multiple and entirely ordinary ways that a consumer can erroneously conclude that they have

received and unlawful prerecorded call and make a complaint where none was warranted. Additionally,

Defendants have advised the FTC of the ease with which unauthorized third parties can misuse a

telephone number identified with legitimate CLEC's such as Defendants, and the FTC has further

acknowledged the accuracy of this point. Accordingly, no weight or inference of wrongdoing can be

derived from the alleged numbers of complaints received by the FTC as they constitute highly

prejudicial evidence akin to an inadmissible survey. Such list is inadmissible hearsay.

## FIFTEENTH AFFIRMATIVE DEFENSE

15.     Any award of statutory penalties would be excessive under the Fifth and Fourteenth

Amendments to the U.S. Constitution.

## SIXTEENTH AFFIRMATIVE DEFENSE

16.      The Statute that the government relies on, 16 C.F.R. 310 et. seq. is void for vagueness in that

it does not give notice to the average person what conduct is prohibited. In fact, not one, but two

lawyers, including a former FTC staff attorney was unable to determine what the statute prohibited.

The terms "facilitated" and "substantial assistance" in the context of this action are vague and

ambiguous as applied and are otherwise arbitrarily and capriciously applied to Defendants. (Violation

of the Administrative Procedures Act.)

## SEVENTEENTH AFFIRMATIVE DEFENSE

17.     Construing a statute like 16 C.F.R. 310 et. seq., that governs the making of telemarketing

calls, to impose liability on parties who have not made such telemarketing calls, or whom otherwise

have no agency or other relationship with the actual callers violates due process under the Fifth and

Fourteenth Amendments to the U.S. Constitution. The FCC recently ruled that under the TCPA a third

party may only be held liable if a common law agency relationship exists. The TCIA only allows

liability to attach with "intent to cause (economic) harm." Imposing liability against a non-agent, up-

stream, several times removed, communications provider will open up a "Pandora's box" of litigation. Plaintiff's complaint fails to allege an agency relationship with any of the "caller" defendants.

## EIGHTEENTH AFFIRMATIVE DEFENSE

18.       Plaintiffs claims are barred, in whole or in part, by applicable state and federal statutes of limitations.

## NINETEENTH AFFIRMATIVE DEFENSE

19.       With respect to the North Carolina claim (Count VIII), providers of Caller Id services are not liable under the statute cited by Plaintiffs. What Plaintiffs are describing is CNAM services in the telecommunications industry and are specifically excluded from liability under N.C. Gen. Stat. 75-102(i) " . . .  No provider of telephone Caller ID services shall be held liable for violations of this subsection committed by other individuals or entities."  The governments complaint alleges that the alleged "TMC enterprise" provided Caller ID ("CNAM") services.

## TWENTIETH AFFIRMATIVE DEFENSE

20.       When drafting various legislation, Congress intentionally excluded from liability "non-harmful spoofing", acknowledging that there are legitimate uses for "spoofing" numbers. For example under the Truth in Caller ID Act, liability is imposed only where the harmful spoofing is done "with the intent" to cause (economic or other) harm. The FTC now seeks to impose liability on a telecommunications provider that has no intent whatsoever other that to provide and offer this service. It is impossible to reconcile the two statutes and as such, are in conflict with one another.

## TWENTYFIRST AFFIRMATIVE DEFENSE

21.       The other named Defendants that are alleged to have violated the TSR's did not need Defendants in order to spoof numbers. In fact they needed no company whatsoever, a fact that the FTC has acknowledged.

**TWENTYSECOND AFFIRMATIVE DEFENSE**

22.      Sharing Calling Name revenue is a standard practice in the Telecommunications industry.

**TWENTYTHIRD AFFIRMATIVE DEFENSE**

23.      Providing CNAM services is a standard service in the telecommunications industry. Every telecommunications provider in the nation provides or is able to provide CNAM services. AT&T, Trans Network Services, Inc., make over a billion dollars and half a billion dollars,  respectively from CNAM dip revenue. To the extent the FTC seeks to impose liability on Defendants for engaging in the exact same conduct as its larger brethren and while ignoring every other CNAM provider, violates the U.S. Constitution requirement and guarantee of Equal Protection.

**TWENTYFOURTH AFFIRMATIVE DEFENSE**

24.      The conduct alleged to be in violation of the various referenced statutes was in fact, legal conduct.

**TWENTYFIFTH AFFIRMATIVE DEFENSE**

25.      To the extent the FTC is alleging that Defendants had to "guess" what information was being sought after in their CID's, Defendants are not aware of any law, statute, practice or case that requires a party to guess and or speculate as to what information is to be provided. Had the FTC asked for "end user" information as opposed to whom the "subscriber" or "client" was for a particular number, Defendants may have provided such information. Defendants, and all of them, answered each and every CID, Subpoena, and casual inquiry into the assignment of and who the subscriber was for each of the telephone numbers the FTC sought information on.

**TWENTYSIXTH AFFIRMATIVE DEFENSE**

26.      While it may be true that Defendants received various numbers of complaints, some on a daily

basis for a period of time, Defendants not only responded to each and every one of them, but also took

immediate action to make sure that these complainants never received another unwanted telemarketing

call from Defendants clients. Every single caller that made a complaint was favorably resolved by

Defendants, most of them on the very same day.

## TWENTYSEVENTH AFFIRMATIVE DEFENSE

27.     Defendants did not provide the portal the Plaintiffs allege allowed various nefarious activity,

rather, Southern New England Telephone ("SNET") and Trans Network Services, Inc. ("TNSI") et. al,

provided such portal(s).

## TWENTYEIGHTH AFFIRMATIVE DEFENSE

28.     This court lacks personal jurisdiction over each of the Defendants herein.

## TWENTYNINTH AFFIRMATIVE DEFENSE

29.     This Court is an improper venue for this litigation. The proper venue is the state of Oregon

because if the Defendants did anything remotely associated with this litigation, they did so from

Oregon. Each and every other defendant has entered into Consent orders with the FTC. No Florida

Defendants remain once the court enters its order adopting such Consent orders.

## THIRTIETH AFFIRMATIVE DEFENSE

30.     16 C.F.R. 310. et. seq., is unconstitutional as applied to Defendants in this case. Such statute

contains a "safe harbor" for sellers and telemarketers who actually place the calls that are alleged to

have violated the statute. Sellers and Telemarketers can avoid liability under the first safe harbor if 3%

or fewer of their campaign calls are "dropped". The second safe harbor applies to sellers or

telemarketers who may avoid liability if they comply with a set of six procedures during the course of

their campaign. There is no such "safe harbor" for alleged facilitators. In other words, the person who

actually makes the illegal call can avoid liability under one of the two "safe harbors" but under no

circumstances/situations can an alleged facilitator avoid such liability.  Such treatment violates the

guarantee of equal protection clause of the U.S. Constitution, and due process under same.

### THIRTYFIRST AFFIRMATIVE DEFENSE

31.      The conduct of Defendants is not the type of conduct that the FTC Act contemplates as being

violative of the act. Defendants offered telecommunications services to the public. Such service or

offering of such service is not alleged to be fraudulent or in any way a deceptive act or practice except

to the extent the FTC alleges a telecommunication company can be alleged to have facilitated illegal

telemarketing by the sheer act of offering and providing telecommunication services to the general

public. The very thing that the FCC and state public utilities commissions *require* Defendants to offer.

Defendants acknowledge that the FTC Act informs that any violation of the TSR's violates the Act.

However, the mere offering of a telecommunications services was not contemplated as being fraudulent

under the Act or the TSR's.

### THIRTY SECOND AFFIRMATIVE DEFENSE

32.      Each of the other defendants whom entered into consent orders complied with one or both of

the safe harbors found in 16 C.F.R. 310 pursuant to legal advice. No TSR violations occurred

and therefore no facilitating occurred.

### DEFENDANTS  INTERNATIONAL TELEPHONE CORPORATION and PACIFIC TELECOM COMMUNICATIONS GROUP COUNTERCLAIMS AGAINST FEDERAL TRADE COMMISSION

1.      Plaintiff, Pacific Telecom Communications Group ("PTCG"), is a corporation organized under

the laws of the state of Nevada with its principal office located in Los Angeles, California, and whose

primary business is telecommunication services available to the public in the United States of America.

PTCG is duly licensed by the Federal Communications Commission, the Public Utilities Commission

for the state of Montana, and the State of Washington and until recently held state licenses in the states

of Oregon and North Dakota.

2.      Plaintiff International Telephone Corporation ("ITC"), is an international business corporation organized under the laws of Belize, C.A., with its principal office located at 8 Marine Parade, Belize City, Belize, C.A. and whose business is the provision of telecommunication services to the public in the United States of America and elsewhere.

3.      Defendant Federal Trade Commission ("FTC") is an independent agency of the United States of America charged with regulating, among other things, commerce in the United States of America. The commission enforces, among others, section 5(a) of the FTC Act, 15 U.S.C. § 45 (a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The Commission also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.

4.      At all relevant times herein, each and all of the Defendants were acting in their official capacity.

## THE BACKGROUND

5.      Telephone Management Corporation began its business in 1974 providing, among other things, analyses of telecommunications contracts and rates for services contained therein. Many years later TMC discovered an anomaly in the definition of the term common carrier and exploited this anomaly into another service product which discovered overpayment of excise and other tax on state and federal taxation on the purchase of telecommunications service and equipment. On or about 2007 TMC became aware of niche industry within the telecommunications field called CNAM. CNAM is short for "calling name". Each time a telecommunication company queries another telecommunication company's data base to retrieve callerid information a small royalty or "dip fee" is paid to the telecommunication company providing such information. TMC engaged in this business until 2008 when it spun off this service to TMCallerID, LLC.  TMCallerID obtained its data base of psuedo "ANI's" or automated number identifiers from Southern New England Telephone (["SNET"], a

subsidiary of AT&T), Paetech, Bayring Communications, Trans Network Services, Inc. ("TNSI")
among others. Following threats of and actual frivolous litigation against TMCallerID for making
telemarketing calls it in fact did not make or have anything to do with, it spun off its CNAM business
to ITC in an effort to derail further frivolous litigation. As the expense for ANI's from the
aforementioned companies rose, the viability of the business came into question. It was at this time that
Mr. Accuardi, owner of TMC, et.al. purchased a majority interest in PTCG. Such purchase gave ITC
the ability to compete with the likes of AT&T and TNSI. (TNSI purchased Paetech and other CNAM
companies during the late 2000's. TNSI's current revenues are in excess of Five Hundred Million
dollars. On information and belief, it is the number two generator of CNAM revenue behind SNET.
Note: ALL Carriers pay and or receive CNAM dip fees.)

6.      On or about 2008 the Federal Trade Commission began investigating Plaintiffs companies for
alleged violation of the Telemarketing Sales Rules, C.F.R. Section 310 et. al. After several months of
investigation the FTC issued no violations. At the end of said investigation plaintiff's agreed to
cooperate and correspond with the FTC with regard to complaints received on the FTC's DO NOT
CALL website and of which numbers assigned to plaintiffs were allegedly identified as the offending
number. Among other things agreed on, Plaintiffs agreed to respond to "informal" requests for
information from the FTC. This agreement gave the FTC the ability to seek information without the
need for subpoena or CID, and saved the FTC the expense of having to compensate plaintiffs for such
information.  Over the course of the next two years plaintiff's regularly communicated with the FTC
pursuant to that agreement. In late 2011 or early 2012 plaintiff's conferred with Jim Davis and Matthew
Ebert of the FTC, advising each that plaintiff's would no longer supply the FTC having discovered that
the expense of cooperating with such FTC's request was over Forty Thousand Dollars annually.

7.      Within weeks of being notified of the cancellation of their agreement the FTC began
investigating plaintiffs once more for the exact same conduct that they had investigated previously and

having issued no violations. Plaintiff's business practices had not changed materially during that time.

8.      On or about September of 2012 plaintiff's became aware that the FTC was holding a "robo-calling summit" aimed at encouraging businesses and consumers, along with the FTC in formulating ways to reduce or eliminate illegal telemarketing. On or about October 18, 2012, Plaintiff's attended this summit and while there sought and received an audience with the FTC's director of consumer affairs to discuss meaningful ways to substantially reduce or eliminate illegal telemarketing practices. At the commencement of said meeting in became immediately apparent to plaintiff's and plaintiff's counsel that the FTC had no interest in plaintiff's ideas. In stead, Lois Griseman, Assistant Director for Consumer Affairs, and William Maxson, staff attorney for the FTC, accused plaintiffs of being responsible for the majority of complaints it had received on its web-site alleging that over a third of the three million complaints it had received that year involved numbers allegedly assigned Plaintiff's. Griseman informed plaintiffs that their business model lacked any legitimacy and informed plaintiff's that their "business model is illegal" and that "there is no legitimate use for their CNAM business." Griesman further stated that if plaintiffs didn't "shut down their business, immediately, that it would not be a matter of if the FTC would come down on them, but rather how hard the FTC would come down on them. When asked why the change in position regarding plaintiff's business Maxson responded that it was primarily due to the fact that plaintiff's had ceased cooperating with the FTC and was now being asked to compensate plaintiffs for the supply of information and cooperation pursuant to statute authorizing such compensation. And that the only possible reason plaintiffs stopped cooperating with the FTC was because it was "clear that you are engaged in illegal conduct."

9.      Believing the threat by the FTC, plaintiff's were forced ceased its CNAM operations on October 31st, 2012.  Fifteen months later, plaintiff's received an email correspondence from the FTC that contained a sample complaint for violating the Telemarketing Sales Rules (the complaint alleges that plaintiffs illegally facilitated over 3 billion illegal telemarketing calls) seeking millions in fines and

that alleges plaintiff consciously avoided knowing of their clients alleged illegal dialing practices,

failed to cooperate with FTC and other investigations and encouraged illegal conduct by assigning

ANI's to its subscribers. In fact, plaintiff's answered each and every question directed to them, supplied

all of the information required by the FTC, actually stopped thousands of illegal telemarketing calls,

supplied the FTC with information that resulted in FTC obtaining at least three consent orders imposing

life time bans for robo-calling for each of the defendants in those cases, and though plaintiff's did share

CNAM revenue with its subscribers that amount paid to them was a small fraction of the cost of each

call and therefore hardly an incentive to violate the TSR's where the fine for EACH violation is sixteen

thousand dollars. The FTC' position to the contrary is untenable.

10.    Pacific Telecom Communication Group is a common carrier.  Common carriers are not subject to

the jurisdiction of the FTC. Instead, common carriers are subject to the jurisdiction of the Federal

Communications Commission. ("FCC") To date, plaintiffs are aware that they have been and are

currently being investigated by the FCC and notices of any kind have been received from the FCC for

any violations.

11.       On or about early 2009 plaintiff's began to receive civil investigative demands from various

attorneys general regarding numbers alleged assigned to plaintiffs and of which appeared on complaint

forms from consumers alleging that these numbers appeared in their caller ID handsets etc . . .

Plaintiff's similarly began to receive complaints from consumers asking that the telemarketing calls

displaying their numbers cease. Plaintiffs complied and successfully stopped all unwanted calls.

Plaintiffs sought legal advice regarding their business model as it related to the TSR's and received

such legal opinion from counsel. Counsel opined that plaintiff's business model may be of interest to

regulatory authorities but if plaintiff's complied with the safe harbor provisions of the TSR's that while

they may get some attention from such authorities, that it was unlikely that it would result in any

violations under the law. Because such legal  advise came from one of plaintiff's nephews, Robert C.

Rengo, then a principal shareholder of plaintiff's, chose to not rely on such opinion and instead engaged another law firm, MacMurray, Petersen and Schuster, LLP, whom held themselves out as "experts in the field" for their legal opinion. Plaintiff's paid in excess of ten thousand dollars for such opinion. On or about April of 2009, said law firm submitted their legal opinion in a  13 page memorandum of law that in essence mirrored the opinion of their previous attorney. They advised and compiled a handbook to be distributed to plaintiff's subscribers advising how to comply with the TSR's which included, among other things, compliance with the safe harbor rules of the TSR's.

12.     During the course of defending another client in a similar TSR matter, plaintiff's counsel became aware that the governments position with regard to "facilitating" illegal telemarketing calls that the safe harbor does not apply. The government maintains that position to this day. Counsel has come to agree with the government that, as written, the TSR's while having safe harbor provision for both dropped calls and actual sellers or dialer, there is no such safe harbor for any alleged "facilitators". Stated another way, the people responsible for actually making the calls gets a get out of jail free card, but the alleged facilitators do not. (Unless, apparently, the facilitator acts as "watchdog" over all of its subscribers.)

13.     C.F.R. § 310(4) is unconstitutionally void for Vagueness in general or as applied to these defendants. A statute is unconstitutionally void for vagueness if a reasonable lay person is unable to determine what is required to comply with the statute. A statute is void for vagueness if it fails to give notice to an individual about what is the proscribed conduct to comply with the statute.

14.     In the case at bar, Plaintiff's engaged and paid for not one but two separate legal opinions. One from experts in the field of telecommunications and consumer protection the other from counsel engaged in consulting in the telecommunications industry for over a decade. Each opinion stated that following a particular path of conduct would avoid liability under the TSR's. The FTC is currently

seeking untold millions dollars in fines from plaintiffs for violating the TSR's prohibition on facilitating illegal telemarketing calls even though plaintiff's engaged legal counsel twice and followed each of their advised course of conduct in an effort to comply with the federal statute. Given the fact that two or more competent attorneys could not (apparently) figure out a proscribed course of conduct to comply with the TSR's, it goes without saying that a reasonable lay person would find it similarly impossible. The TSR's facilitating statute contains NO language that describes the prohibited conduct. Case law on the subject is limited to cases of fraud where it defines what is prohibited conduct and in each of those cases, an agency relationship existed. (The FCC recently opined in the Dish Network case, that in order for there to be 3rd party liability under the Telephone Consumer Protection Act ("TCPA") that a plaintiff must plead and prove an agency relationship in order for liability to extend to third parties. The FTC has failed to allege any such relationship between the plaintiff's and each of the alleged sellers or callers and Plaintiff's believe that they must do so to prove facilitating under the TSR's which basically prohibit the same conduct alleged by the FTC. (Violating the proscription of the TSR's by calling persons registered on the federal DNC data base.)

## COUNT ONE

## GOVERNMENT TAKING WITHOUT COMPESATION

15.     On or about Oct 18, 2012 the FTC held a robo-calling summit in Washington D.C. Defendants participated in such summit and while there met with FTC personnel acting in their official capacity (Lois Greisman, William Maxson) to discuss and advise the FTC on the many ways Defendants had devised to stop unwanted telemarketing calls.  Defendants did so advise and in response the FTC said "there is no legitimate reason for your business model. Close it down now, or it won't be a matter of when we come down on you, but rather, how hard." Acknowledging the vast resources and power of the Federal government Defendants felt they had no choice to comply or face the wrath of the FTC. The business was in fact legal, and the FTC's threat amounts to a government taking without fair and just compensation. In the alternative the governments action constituted a constructive taking without

fair and just compensation.

## COUNT TWO
## RETALIATORY PROSECUTION

16.      Plaintiffs re-plead each of the previous paragraphs as though fully stated hereunder and

incorporates them by reference. The FTC had been investigating Defendants for six years up until that

fateful meeting. After their first investigation resulted in no fines or other sanctions being imposed on

Defendants, Defendants entered into an informal relationship with the FTC wherein Defendants

supplied, at their own expense, information that lead to at least three litigations (and counting) for

violations of the TSR's each of which resulted in the named Defendants entering into Consent orders,

two of which, at this writing, were accepted and entered into by the respective Federal Courts. At some

point Defendant audited their expenses with respect to such cooperation and determined that they were

spending as much as forty thousand dollars per year in such cooperation. On legal advise, Defendants

informed the FTC that it would no longer provide information without the FTC sharing in such

expense. The FTC declined and Defendants stopped the "informal" agreement. (Defendants still

answered all legal summons, CID's, etc . . . ) Within a short time thereafter the FTC began, in earnest,

to bring down Defendants. Defendants were  and continue to be retaliated against for refusing to pay to

do the FTC's bidding. Their litigation in the So. Dist. of Florida is punishment for demanding

compensation from the FTC and plaintiffs subsequent termination of the agreement to cooperate.

## COUNT THREE
## UNJUST ENRICHMENT

17.      Defendants re-plead each of the previous paragraphs as though fully stated hereunder and

incorporate them by reference herein.  Defendants expended considerable sums of money providing

valuable information to the FTC in exchange for a mutual understanding that Defendants would not be

sued for its provision of telecommunication services. The FTC received the benefit of such information

to the detriment of Defendants without just compensation for the resources that went in to

accumulating, printing and providing such information. Instead, in return Defendants were required to

attend depositions and turn over personal, financial information and were informed that they were

going to be sued even when previous investigations revealed no wrong doing on the part of Defendants

and where Defendants conduct in conducting its business had not changed materially from the original

investigation that revealed no violations.

**COUNT FOUR**
**DECLARATORY JUDGMENT**

18.      Plaintiffs  respectfully ask this court to declare that the provision of Calling Name

Services are "common carriage" under <u>Clark</u> v <u>Avatar,</u> (Civil Action No. H-13-2777 So. Dist. Texas,

Houston Div.) and therefor exempt under the FTC Act.

**COUNT FIVE**
**42 U.S.C. 1983**

19.      The FTC is a government administrative agency. Plaintiffs are private citizens of the

United States of America. While acting in their official capacity, and under the color of state title,

employees of the FTC violated PTCG and TMC rights as citizens of the United States of America by,

among other things, finding them guilty of violating various federal and state statutes without being

accorded due process of law and forcing them, by way of viable threat, to close down a profitable, legal

enterprise. Additionally, the government improperly violated Plaintiffs right to free speech.

**PRAYER FOR RELIEF**

WHEREFORE with respect to each of Plaintiffs claims they demand compensation in an amount

to be determined at trial, along with dismissal of the respective GOVERNMENT claims with prejudice,

punitive damages where and if allowed, fees and costs, including but not limited to reasonable attorney

fees and any further relief this court deems just and proper. With respect to Count Four a declaration by

the Court that CNAM is "common carriage" or "common carrier" activity, reasonable fees and costs,

including reasonable attorney fees, along with other such relief the Court deems just and proper.

Dated this [1st] day of June, 2015                    Respectfully submitted,


                                                       /S/ F. Antone Accuardi

                                                       F. Antone Accuardi, OSB 974613
                                                       2331 SW 5th Ave.
                                                       Portland, Oregon 97201
                                                       (503) 223-7747  cellular (971) 404-4185
                                                       taxlaw@justice.com
                                                       Trial Attorney for Defendants
                                                       Pacific Telecom, TMC. ITC, ITC, LLC
                                                       TmcallerID, and Fred Accuardi

                                                       Edwin M. Walker
                                                       Walker Law Firm
                                                       500 Australian Ave. Suite 600
                                                       West Palm Beach, Florida 33401
                                                       (561) 689-1512
                                                       ewalker3@walkerlaw.net
                                                       Local Counsel Only

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on June 1, 2015 on all counsel or parties of record on the service list below.

/S/ Edwin M. Walker
_____
Edwin M. Walker

SERVICE LIST

Emily Cope Burton
Bikram Bandy
Federal Trade Commission
600 Pennsylvania Ave. NW
Washington, DC 20580
(202) 326-2728 eburton@ftc.gov
(202) 326-2978 bbandy@ftc.gov
Attorneys for Plaintiff
Federal Trade Commission

Devin Laiho
Assistant Attorney General
Consumer Protection
Ralph L Carr Colorado Judicial Center
1300 Broadway, Seventh Floor
Denver, CO 80203
(720) 508-6219
Devin.Laiho@state.co.us

Katherine A Kiziah
Assistant Attorney General
1515 North Flagler Dr., Suite 900
West Palm Beach, FL 33401
(561) 837-5000
katherine.kiziah@myfloridalegal.com

Marguerite M. Sweeney
Deputy Attorney General
Office of the Indiana Attorney General
302 W. Washington St., 5th Floor
Indiana Government Center South
Indianapolis, IN 46204
(317)232-1011
marguerite.sweeney@atg.in.gov

Meghan S. Stoppel
Assistant Attorney General
Kansas Attorney Generals Office

120 SW 10th Ave., Second Floor
Topeka, KS 66612
(785) 296-3751
Meghan.Stoppel@ag.ks.gov

Frank Farmer
Sp. Asst. Attorney General
Office of Mississippi Attorney General
PO Box 1174
Jackson, MS 39215-1174
(601) 961-5821
Frank.Farmer@psc.state.ms.us

Joshua M. Jones
Assistant Attorney General
PO Box 861
St. Louis, MO 63188
(314) 340-6816
joshua.jones@ago.mo.gov

David N. Kirkman
Sp. Dep. Attorney General
Consumer Protection Div.
North Carolina Dept. of Justice
114 West Edenton Street
PO Box 629
Raleigh, NC 27602-0629
(919) 716-6033
dkirkman@ncdoj.gov

Megan E. McNulty
Associate Asst. Attorney General
Consumer Protection Section
Office of Ohio Attorney General
One Government Center, Suite 1340
Toledo, Ohio 43604
(419) 245-2550
megan.mcnulty@ohioattorneygeneral.gov

Shiva K Bozarth
Chief of Compliance
Tennessee Regulatory Authority
502 Deadrick Street 4th Floor
Nashville, Tennessee 37243

Sarah Shifley
Assistant Attorney General
Consumer Protection Div.
Washington State Attorney General
800 Fifth Ave., Ste.2000
Seattle, WA 98104
(206) 389-3974
sarah.shifley@atg.wa.gov