THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.: <u>0:15-cv-60423 WJZ</u>

Federal Trade Commission, Attorney General
for the United States of America, the State of
Missouri, Chris Koster Attorney General for
the state of Missouri, The State of Florida,
Pamela Jo Bondi Attorney General for the
State of Florida, The State of North Carolina,
and Roy Cooper Attorney General for the
State of North Carolina, The State of Ohio,
and Michael Dewine Attorney General for the
State of Ohio,

        Plaintiffs.

          vs.

Caribbean Cruise Lines, Inc., a Florida
corporation, Linked Services Solutions, Inc.,
A Florida limited liability company, Economic
Strategy, LLC, a Florida limited liability
company, Scott Broomfield, individually and
as an officer, director or owner of Linked
Service Solutions, Jason Birkett, individually
and as an officer, director or owner of Linked
Service Solutions, LLC, Jacob DeJongh,

**FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS FOR DEFENDANTS TELEPHONE MANAGEMENT CORPORATION, PACIFIC TELECOM COMMUNICATIONS GROUP, INC., ITC, LLC, ITC INTERNATIONAL, TMCALLERID, and FRED ACCUARDI**

JURY TRIAL DEMANDED

[PTCG, TMC, et., al. FIRST AMENDED ANSWER, AFF. DEFS. AND COUNTERCLAIMS] - 1

individually and as an officer, director or

owner of Economic Strategy, LLC, Pacific

Telecom Communications Group, a Nevada

Corporation, Telephone Management

Corporation, an Oregon Corporation,

TMCallerID, an Oregon Limited Liability

Company, International Telephone, a

Wyoming limited liability company,

International Telephone Corporation, a

Belize International Business Corporation,

Fred Accuardi, individually and as officer

director or owner of Pacific Telecom

Communications Group, International

Telephone Corporation, International

Telephone, LLC, Telephone Management

Corporation, and T M Caller ID, LLC and

Steve Hamilton, individually and as an officer,

director or owner of Pacific Telecom

Communications Group.

Defendants.

DEFENDANTS PACIFIC TELECOM COMMUNICATIONS GROUP, INC., TELEPHONE

MANAGEMENT CORPORATION, ITC INTERNATIONAL, ITC, LLC, TMCallerID, and

FRED ACCUARDI FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES and

COUNTERCLAIMS

1.

NOW COMES DEFENDANTS Pacific Telecom Communications Group, Inc. ("PTCG"), Telephone Management Corporation ("TMC"), ITC, LLC, ITC International, TMCALLERID and Accuardi, collectively, "Defendants" by and through the undersigned counsel who answer Plaintiffs complaint individually and not jointly as follows:

2.

As to the allegations in paragraphs 1–11, Defendants admit that the statutes speak for themselves, but deny that any of them have been violated by Defendants. Except as expressly admitted, Defendants deny each and every allegation in these paragraphs.

3.

As to the allegations in paragraphs 12–15, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in these paragraphs and on that basis deny each and every one.

4.

As to the allegations in  paragraph 16, Defendants deny each and every one of them.

5.

As to the allegations in paragraphs 17 and 18, Defendants deny each and every one of them.

6.

As to the allegations in paragraphs 19–29, Defendants admit that the statutes speak for themselves but deny that any of the statutes have been violated by Defendants. Except as expressly admitted, Defendants deny each and every allegation in these paragraphs.

7.

As to the allegations in paragraphs 30–32, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in these paragraphs and on that basis deny each and every one of them.

8.

As to the allegations in paragraph 33 Defendants admit that PTCG is a for profit corporation with its principal place of business located in Los Angeles, California, but deny each and every other allegation. Except as expressly admitted, Defendants deny each and every allegation in this paragraph.

9.

As to the allegations in paragraph 34, Defendants admit International Telephone Corporation is a foreign for profit corporation. Except as expressly admitted, Defendants deny each and every other allegation.

10.

As to the allegations in paragraph 35, Defendants admit that International Telephone, LLC is a for profit Wyoming corporation with its principal office located in Portland, Oregon but deny each and every other allegation.

11.

As to the allegations in paragraph 36, Defendants admit that TMCallerID is (was) a for profit corporation with its principal office located in Portland, Oregon but denies each and every allegation.

12

As to the allegations in paragraph 37, Defendants admit the TMC is a for profit corporation with its principal office located at 2331 SW 5th Ave. Portland, Oregon, but deny each and every other allegation.

13.

As to the allegations in paragraphs 38–40, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in these paragraphs and on that basis deny each and every one.

14.

As to the allegations in paragraph 41, Defendants admit that Fred A. Accuardi is an

owner of PTCG,  owner President of TMC and an owner manager of of IT, LLC and TMCallerID, and *was* a manager of ITC,  but deny each and every other allegation.

15.

As to the allegations in paragraph 42 Defendants admit that Steve Hamilton is an owner President of PTCG but deny each and every other allegation.

16.

As to the allegations in paragraph 43, Defendants admit.

17.

As to the allegations in paragraph 44, Defendants deny each and every one.

18.

As to the allegations in paragraph 45–46, Defendants deny each and every one.

19.

As to the allegations in paragraph 47, Defendants admit that the statute speaks for itself, but deny each and every other allegation.

20.

As to the allegations in paragraphs 48–62, Defendants admit that the statutes speak for themselves . With respect to paragraphs 57, and 61, Defendants specifically deny that any violations occurred. Defendants deny each and every other allegation. With respect to paragraph 61, the statute speaks for itself and informs Defendants that they may not be held liable by the statutes own language.

21.

As to the allegations in paragraph 63–71, Defendants lack sufficient knowledge or information  sufficient to form a belief about the truth of the allegations and on that basis denies each and every one.

22.

As to the allegations in paragraph 72, Defendants deny each and every one.

[PTCG, TMC, et., al. FIRST AMENDED ANSWER, AFF. DEFS. AND COUNTERCLAIMS] - 5

23.

As to the allegations in paragraph 73, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations and on that basis denies each and every one.

24.

As to the allegations in paragraph 74, Defendants deny each and every one.

25.

As to the allegations in paragraph 75, Defendants lack  knowledge or information sufficient to form a belief about the truth of the allegations and on that basis denies each and every one.

26.

As to the allegations in paragraph 76, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations and on that basis deny each and every one. Defendants further object to the graphical chart as vague and ambiguous, and as not in compliance with Fed. R. Civ. P. Rule 8.

27.

As to the allegations in paragraphs 77-78, Defendants lack  knowledge or information sufficient to form a belief about the truth of the allegations and on that basis deny each and every one.

28.

As to the allegations in paragraphs 79-82, Defendants admit that the case cited and the  statutes speak for themselves but lack knowledge or information sufficient to form a belief about the truth of the allegation and on that basis deny each and every one.

29.

As to the allegations in paragraphs 83-91, Defendants admit that the statutes speak

for themselves. As to the remaining allegations therein, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis deny each and every one.

30.

As to the allegations in paragraph 92, Defendants deny each and every one.

31.

As to the allegations in paragraph 93, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and on that basis deny each and every one. Defendants further object to the graphical chart as vague and ambiguous, and as not in compliance with Fed. R. Civ. P. Rule 8.

32.

As to the allegations in paragraph 94, PTCG admits that is was *assigned* thousands of phone numbers, but denies that it leased numbers to the alleged TMC enterprise, or that it leased numbers to telemarketers and denies every other allegation.

33.

As to the allegations in paragraphs 95–99, Defendants deny each and every one.

34.

As to the allegations in paragraph 100, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation and on that basis deny each and every one.

35.

As to the allegations in paragraphs 101–104, Defendants deny each and every one.

36.

As to the allegations in paragraph 105, Defendants admit that approximately 1 in 3 calls generate a CNAM "dip" for which a small fee is paid. (One hundredth of a penny)

37.

As to the allegations in paragraph 106–108, Defendants deny each and every one.

38.

As to the allegation in paragraph 109, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegation and on that basis denies each and every one. Defendants further object to the graphical chart as vague, ambiguous and as not in compliance with Fed. R. Civ. P. 8.

39.

As to the allegations in paragraph 110, Defendants deny each and every one.

40.

As to the allegations in paragraph 111, Defendants admit that they responded to civil investigative demands  requiring the alleged TMC enterprise to identify the "Clients" assigned various phone numbers but deny that the alleged TMC enterprise failed to provide this information, and deny that the TMC enterprise was required to "guess" what information that government was seeking. Not a single time did the government ask for the "end user". Defendants admit that they assigned certain phone numbers to Economic Strategies but specifically deny that this information was not provided to the government.

41.

As to the allegations in paragraph 112, Defendants deny each and every one.

42.

As to the allegations in paragraphs 113–128, Defendants deny each and every one.

43.

As to the allegations in paragraphs 129–136, Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations and on that basis deny each and every one.

44.

As to the allegations in paragraphs 137–139, Defendants deny each and every one.

45.

As to the allegations in paragraph 140, Defendants admit that the statute speaks for itself, but denies the remaining allegations.

46.

As to the allegation in paragraph 141, Defendants admit that the statute speaks for itself, but denies each and every other one.

47.

As to the allegations in paragraph 142, Defendants admit that the statute speaks for itself, but denies each and every other one.

48.

As to the allegations in paragraph 143, Defendants lack knowledge or information sufficient to form a belief as to truth of the allegations and on that basis deny each and every one.

49.

As to the allegations in paragraphs 144–146, Defendants deny each and every one.

50.

As to the allegations in paragraph 147, Defendants admit that the statute speaks for itself, but deny each and every allegation.

51.

As to the allegations in paragraphs 148–150, Defendants deny each and every one.

52.

As to the allegations in paragraphs 151–155, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis deny each and every one.

53.

As to the allegation in paragraphs 156–157, Defendants deny each and every one.

54.

As to the allegation in paragraphs 158–159, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and on that basis deny each and every one.

55.

As to the allegations in paragraphs 160–165, Defendants deny each and every one.

56.

As to the allegations in paragraphs 166–173, Defendants admit that the statutes speak for themselves, but deny that Defendants violated any of them. Except where specifically admitted, Defendants deny each and every one.

57.

Defendants deny that the Plaintiff's, each and every one,  are entitled to any relief.

## DEFENDANTS AFFIRMATIVE DEFENSES

**Without waiving the foregoing or assuming the burden of proof with respect to its affirmative defenses, defendant alleges the following affirmative defenses.**

1.

## FIRST AFFIRMATIVE DEFENSE

The complaint fails to state a claim upon which relief can be granted.

2.

## SECOND AFFIRMATIVE DEFENSE

At all times relevant to the complaint, Defendant PTCG was an intra–LATA CLEC subject to regulation by Oregon, Washington, Montana, and North Dakota public service commission. Under the Federal Communications Act, 47 U.S.C.  § 152(b), the regulation of

[PTCG, TMC, et., al. FIRST AMENDED ANSWER, AFF. DEFS. AND COUNTERCLAIMS] - 10

the provisioning of facilities and services by such intra–LATA and local carriers is presumptively subject to the primary jurisdiction of the respective state commissions in whose jurisdiction such a CLEC operates. Plaintiff's complaint seeks to apply federal law to regulate the use of utility facilities and services circumventing state jurisdiction in violation of 47 U.S.C. § 152(b). The Court should stay, or dismiss this action pending review by such Commission or review by the FCC in order to determine if the provision of phone numbers in the context of CNAM is "common carriage" and therefore exempt from the FTC enforcement powers. This court lacks subject matter jurisdiction.

3.

### THIRD AFFIRMATIVE DEFENSE

There are one or more complaints pending against PTCG in the Federal Communications Commission in which the same issue i.e, whether there has been and abuse or misuse of the this Defendants privileges as a telecommunications carrier. Under the terms of 47 U.S.C. § 152(b), the court should stay or dismiss this action pending final resolution of these issues by such commission.

4.

### FOURTH AFFIRMATIVE DEFENSE

The issue of the propriety of PTCG's use of its facilities and privileges as a common carrier is subject to the primary jurisdiction of the Federal Communications Commission.

5.

### FIFTH AFFIRMATIVE DEFENSE

The Complaint seeks to regulate the terms and conditions under which a telephone common carrier may provide use of its services, facilities and privileges to members of the public and, as such, the complaint would not be within the subject matter jurisdiction of the state of Florida, or any other state or the Federal Trade Commission.

6.

## SIXTH AFFIRMATIVE DEFENSE

As a common carrier PTCG is required to provide access to its services and facilities without discrimination. Since none of the Defendants in fact makes any telemarketing or other prerecorded telephone broadcast calls, Plaintiff's complaint implicitly seeks to require Defendants , and its agents,  to deny use of its telephone numbers (and its right of access to national calling number identifications databases) to customers based on improper, discriminatory criteria, including premature judgments concerning the (alleged) misuse or possible misuse of these facilities.

7.

## SEVENTH AFFIRMATIVE DEFENSE

Some or all of the calls referenced in the Complaint were made to wireless numbers, did not violate any of the referenced statutes because such calls were made within 15 days of the wireless number being ported from wire line service.

8.

## EIGTH AFFIRMATIVE DEFENSE

Some or all of the calls referenced in the Complaint were made to wire line calls that were not on the Do Not Call List but were "call forwarded" to other phones that were on the Do Not Call List.

9.

## NINTH AFFIRMATIVE DEFENSE

Some or all of the calls referenced in the Complaint were not made to any residential line using an artificial or prerecorded voice to deliver a message without prior written consent of the called party, did not violate any of the referenced statutes because the call either (I) was made for emergency purposes; (ii) not made for a commercial purpose; (iii) was made for a commercial purpose but does not include or introduce an advertisement or constitute

telemarketing; (iv) was made by or on behalf of a tax-exempt nonprofit organization; or (v) delivered a "healthcare" message made by or on behalf of, a "covered entity" or its "business associate," as those terms dare defined in the HIPPA Privacy rule, 45 C.F.R. 160.103.

10.

### TENTH AFFIRMATIVE DEFENSE

As a condition to the use of Defendant PTCG's telephone numbers, Defendants require clients to agree in writing to comply with all federal laws and regulations and provide clients with a detailed manual prepared by a former Federal Trade Commission staff attorney for the express purpose of assuring compliance with all governing federal regulations dealing with prerecorded calls and automated dialing.

11.

### ELEVENTH AFFIRMATIVE DEFENSE

At all times relevant to the matters alleged in the Complaint, Defendants acted pursuant to legal advice of a former Federal Trade Commission staff attorney with respect to complying with governing federal regulations dealing with prerecorded calls. If Defendants violated any regulation, such violation was not made while knowing or consciously avoiding knowing that Defendants customers were violating any statutes. In fact, not a single CID or Subpoenas informed defendants that any violation had occurred, but rather, that some of its customers were being *investigated* for *possible* violations.

12.

### TWEFTH AFFIRMATIVE DEFENSE

The merits of consumer complaints referenced in this Complaint as having been received by the FTC have not been investigated by the FTC. One or more of the Defendants have advised the FTC of the multiple and entirely ordinary ways that a consumer can erroneously conclude that they have received and unlawful prerecorded call and make a complaint where none was warranted. Additionally, Defendants have advised the FTC of the

ease with which unauthorized third parties can misuse a telephone number identified with legitimate CLEC's such as Defendants, and the FTC has further acknowledged the accuracy of this point. Accordingly, no weight or inference of wrongdoing can be derived from the alleged numbers of complaints received by the FTC as they constitute highly prejudicial evidence akin to an inadmissible survey. Such list is also inadmissible hearsay.

13.

### THIRTEENTH AFFIRMATIVE DEFENSE

Any award of statutory penalties would be excessive under the Fifth and Fourteenth Amendments to the U.S. Constitution.

14.

### FOURTEENTH AFFIRMATIVE DEFENSE

The Statute that the government relies on, 16 C.F.R. 310 et. seq. is void for vagueness in that it does not give notice to the average person what conduct is prohibited. In fact, not one, but two lawyers, including a former FTC staff attorney was unable to determine what the statute prohibited. The terms "facilitated" and "substantial assistance" in the context of this action are vague and ambiguous as applied and are otherwise arbitrarily and capriciously applied to Defendants. (Violation of the FTC act and the Administrative Procedures Act.)

15.

### FIFTEENTH AFFIRMATIVE DEFENSE

Construing a statute like 16 C.F.R. 310 et. seq., that governs the making of telemarketing calls, to impose liability on parties who have not made such telemarketing calls, or whom otherwise have no agency or other relationship with the actual callers violates due process under the Fifth and Fourteenth Amendments to the U.S. Constitution. The FCC recently ruled that under the TCPA a third party may only be held liable if a common law agency relationship exists. The TCIA only allows liability to attach with "intent to cause

(economic) harm." Imposing liability against a non–agent, up–stream, several times removed, communications provider will open up a "Pandora's box" of litigation.

16.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiffs claims are barred, in whole or in part, by applicable state and federal statutes of limitations.

17.

## SEVENTEENTH AFFIRMATIVE DEFENSE

When drafting various legislation, Congress intentionally excluded from liability "non–harmful spoofing", acknowledging that there are legitimate uses for "spoofing" numbers. For example under the Truth in Caller ID Act, liability is imposed only where the harmful spoofing is done "with the intent" to cause (economic or other) harm. The FTC now seeks to impose liability on a telecommunications provider that has no intent whatsoever other than to provide and offer this service. It is impossible to reconcile the two statutes and as such, are in conflict with one another.

18.

## EIGHTEENTH AFFIRMATIVE DEFENSE

The other named Defendants that are alleged to have violated the TSR's did not need Defendants in order to spoof numbers. In fact they needed no company whatsoever, a fact that the FTC has acknowledged.

19.

## NINETEENTH AFFIRMATIVE DEFENSE

Sharing Calling Name revenue is a standard practice in the Telecommunications industry.

20.

## TWENTYTIETH AFFIRMATIVE DEFENSE

[PTCG, TMC, et., al. FIRST AMENDED ANSWER, AFF. DEFS. AND COUNTERCLAIMS] - 15

Providing CNAM services is a standard service in the telecommunications industry. Every telecommunications provider in the nation provides or is able to provide CNAM services. AT&T, Trans Network Services, Inc., make over a billion dollars and half a billion dollars,  respectively from CNAM dip revenue. To the extent the FTC seeks to impose liability on Defendants for engaging in the exact same conduct as its larger brethren and while ignoring every other CNAM provider violates the U.S. Constitution requirement and guarantee of Equal Protection.

21.

### TWENTYFIRST AFFIRMATIVE DEFENSE

The conduct alleged to be in violation of the various referenced statutes was in fact, legal conduct.

22.

### TWENTYSECOND AFFIRMATIVE DEFENSE

To the extent the FTC is alleging that Defendants had to "guess" what information was being sought after in their CID's, Defendants are not aware of any law, statute, practice or case that requires a party to guess and or speculate as to what information is to be provided. Had the FTC asked for "end user" information as opposed to whom the "subscriber" or "client" was for a particular number, Defendants may have provided such information. Defendants, and all of them, answered each and every CID, Subpoena, and casual inquiry into the assignment of and who the subscriber was for each of the telephone numbers the FTC sought information on.

23.

### TWENTYTHIRD AFFIRMATIVE DEFENSE

While it is true that Defendants received various numbers of complaints, some on a daily basis for a period of time, Defendants not only responded to each and every one of them, but also took immediate action to make sure that these complainants never received

another unwanted telemarketing call from Defendants clients. Every single caller that made a complaint was favorably resolved by Defendants, most of them on the very same day.

24.

### TWENTYFOURTH AFFIRMATIVE DEFENSE

Defendants did not provide the portal the Plaintiffs allege allowed various nefarious activity, rather Souther New England Telephone ("SNET") and Trans Network Services, Inc. ("TNSI") et. al, provided such portal(s).

25.

### TWENTYFIFTH AFFIRMATIVE DEFENSE

This court lacks personal jurisdiction over each of the Defendants herein.

26.

### TWENTYSIXTH AFFIRMATIVE DEFENSE

This Court is an improper venue for this litigation. The proper venue is the state of Oregon because if the Defendants did anything remotely associated with this litigation, they did so from Oregon. Each and every other defendant has entered into Consent orders with the FTC. No Florida Defendants remain once the court enters its order adopting such Consent orders.

27.

### TWENTYSEVENTH AFFIRMATIVE DEFENSE

16 C.F.R. 310. et. seq., is unconstitutional as applied to Defendants in this case. Such statute contains a "safe harbor" for sellers and telemarketers who actually place the calls that are alleged to have violated the statute. Sellers and Telemarketers can avoid liability under the first safe harbor if 3% or fewer of their campaign calls are "dropped". The second safe harbor applies to sellers or telemarketers who may avoid liability if they comply with a set of six procedures during the course of their campaign. There is no such "safe harbor" for alleged facilitators. In other words, the person who actually makes the illegal call can avoid liability

under one of the two "safe harbors" but under no conditions/situations can an alleged facilitator avoid such liability.  Such treatment violates the guarantee of equal protection clause of the U.S. Constitution.

28.

## TWENTYEIGHTH AFFIRMATIVE DEFENSE

The conduct of Defendants is not the type of conduct that the FTC Act contemplates as being violative of the act. Defendants offered telecommunications services to the public. Such service or offering of such service is not alleged to be fraudulent or in any way a deceptive act or practice except to the extent the FTC alleges a telecommunication company can be alleged to have facilitated illegal telemarketing by the sheer act of offering and providing telecommunication services to the general public. The very thing that the FCC and state public utilities commissions *require* Defendants to offer. Defendants acknowledge that the FTC Act informs that any violation of the TSR's violates the Act. However, the mere offering of a telecommunications services was not contemplated as being fraudulent under the Act or the TSR's.

## DEFENDANTS FRED ACCUARDI, PACIFIC TELECOM COMMUNICATIONS GROUP, INC., and INTERNATIONAL TELEPHONE CORPORATION FIRST AMENDED COUNTERCLAIMS

1.

Plaintiff, Pacific Telecom Communications Group ("PTCG"), is a corporation organized under the laws of the state of Nevada with its principal office located in Los Angeles, California, and whose primary business is telecommunication services available to the public in the United States of America. PTCG is duly licensed by the Federal Communications Commission, the Public Utilities Commission for the state of Montana, and

the State of Washington and until recently held state licenses in the states of Oregon and North Dakota.

2.

Plaintiff International Telephone Corporation ("ITC"), is an international business corporation organized under the laws of Belize, C.A., with its principal office located at 8 Marine Parade, Belize City, Belize, C.A. and whose business is the provision of telecommunication services to the public in the United States of America and elsewhere.

3.

Plaintiff, Fred Accuardi is the principal owner of PTCG and an officer and shareholder of PTCG and ITC.

4.

Defendant, Federal Trade Commission ("FTC") is an independent agency of the United States of America charged with regulating, among other things, commerce in the United States of America. The commission enforces, among others, section 5(a) of the FTC Act, 15 U.S.C. § 45 (a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The Commission also enforces the Telemarketing Act, 15 U.S.C. § § 6101–6108.

5.

Defendants, Greisman, Maxson and Bandy are all employed by the FTC is various capacities.

6.

At all relevant times herein, each and all of the Counterclaim Defendants were acting under color of state title representing the interests of the FTC and United States of America.

## THE BACKGROUND

7.

Telephone Management Corporation began its business in 1974 providing, among

other things, analyses of telecommunications contracts and rates for services contained therein. Many years later TMC discovered an anomaly in the definition of the term common carrier and exploited this anomaly into another service product which discovered overpayment of excise and other tax on state and federal taxation on the purchase of telecommunications service and equipment. On or about 2007 TMC became aware of niche industry within the telecommunications field called CNAM. CNAM is short for "calling name". Each time a telecommunication company queries another telecommunication company's data base to retrieve callerid information a small royalty or "dip fee" is paid to the telecommunication company providing such information. TMC engaged in this business until 2008 when it spun off this service to TMCallerID, LLC.  TMCallerID obtained its data base of psuedo "ANI's" or automated number identifiers from Southern New England Telephone (["SNET"], a subsidiary of AT&T), Paetech, Bayring Communications, Trans Network Services, Inc. ("TNSI") among others. Following threats of and actual frivolous litigation against TMCallerID for making telemarketing calls it in fact did not make or have anything to do with, it spun off its CNAM business to ITC in an effort to derail further frivolous litigation. As the expense for ANI's from the aforementioned companies rose, the viability of the business came into question. It was at this time that Mr. Accuardi, owner of TMC, et.al. purchased a majority interest in PTCG. Such purchase gave ITC the ability to compete with the likes of AT&T and TNSI. (TNSI purchased Paetech and other CNAM companies during the late 2000's. TNSI's current revenues are in excess of Five Hundred Million dollars. On information and belief, it is the number two generator of CNAM revenue behind SNET. Note: ALL Carriers pay and or receive CNAM dip fees.)

8.

On or about 2008 the Federal Trade Commission began investigating Plaintiffs companies for alleged violation of the Telemarketing Sales Rules, C.F.R. Section 310 et. al. After several months/years of investigation the FTC issued no violations. At the end of said

1   investigation plaintiff's agreed to cooperate and correspond with the FTC with regard to

2   complaints received on the FTC's DO NOT CALL website and of which numbers assigned to

3   plaintiffs were allegedly identified as the offending number. Among other things agreed on,

4   Plaintiffs agreed to respond to "informal" requests for information from the FTC. This

5   agreement gave the FTC the ability to seek information without the need for subpoena or

6   CID, and saved the FTC the expense of having to compensate plaintiffs for such information.

7   Over the course of the next two years plaintiff's regularly communicated with the FTC

8   pursuant to that agreement. In late 2011 or early 2012 plaintiff's conferred with Jim Davis and

9   Matthew Ebert of the FTC, advising each that plaintiff's would no longer supply the FTC

10  informal information absent compensation for same having discovered that the expense of

11  cooperating with such FTC's request was over Forty Thousand Dollars annually.

12                                         9.

13       Within weeks of being notified of the cancellation of their agreement the FTC began

14  investigating plaintiff's once more for the exact same conduct that they had investigated

15  previously and having issued no violations. Plaintiff's business practices had not changed

16  materially during that time. Greisman and Bandy et. al., replaced or joined, Ebert and Davis.

17                                        10.

18       On or about September of 2012 plaintiff's became aware that the FTC was holding a

19  "robo-calling summit" aimed at encouraging businesses and consumers, along with the FTC in

20  formulating ways to reduce or eliminate illegal telemarketing. On or about October 18, 2012,

21  Plaintiff's attended this summit and while there sought and received an audience with the

22  FTC's director of consumer affairs to discuss meaningful ways to substantially reduce or

23  eliminate illegal telemarketing practices.  At the commencement of said meeting it became

24  immediately apparent to plaintiff's and plaintiff's counsel that the FTC had no interest in

25  plaintiff's ideas. In stead, Lois Griseman, Assistant Director for Consumer Affairs, and William

26  Maxson, staff attorney for the FTC, accused plaintiffs of being responsible for the majority of

complaints it had received on its web-site alleging that over a third of the three million

complaints it had received that year involved numbers allegedly assigned Plaintiff's. Griesman

informed plaintiffs that their business model lacked any legitimacy and informed plaintiff's that

their "business model is illegal" and that "there is no legitimate use for their CNAM

business." Griesman further stated that if plaintiffs didn't "shut down their business,

immediately, that it would not be a matter of if the FTC would come down on them, but rather

how hard the FTC would come down on them." When asked why the change in position

regarding plaintiff's business Maxson responded that it was primarily due to the fact that

plaintiff's had ceased cooperating with the FTC and was now being asked to compensate

plaintiff's for the supply of information and cooperation pursuant to statute authorizing such

compensation. And that the only possible reason plaintiffs stopped cooperating with the FTC

was because it was "clear that you are engaged in illegal conduct."

11.

Believing the threat by the FTC and acknowledging the awesome power of the Federal

Government to carry out such threat, plaintiff's were forced to cease its CNAM operations on

October 31st, 2012.  Fifteen months later, plaintiff's received an email correspondence from

the FTC that contained a sample complaint for violating the Telemarketing Sales Rules (the

complaint alleges that plaintiffs illegally facilitated over 3 billion illegal telemarketing calls)

seeking billions in fines and that alleges plaintiff consciously avoided knowing of their clients

alleged illegal dialing practices, failed to cooperate with FTC and other investigations and

encouraged illegal conduct by assigning ANI's to its subscribers. In fact, plaintiff's answered

each and every question directed to them, supplied all of the information required by the

FTC, actually stopped thousands of illegal telemarketing calls, suppled the FTC with

information that resulted in FTC obtaining at least three consent orders imposing life time

bans for robo-calling for each of the defendants in those cases, and though plaintiff's did

share CNAM revenue with its subscribers that amount paid to them was a small fraction of the

1 cost of each call and therefore hardly an incentive to violate the TSR's where the fine for

2 EACH violation is sixteen thousand dollars. The FTC' position to the contrary is untenable.

3                                          12.

4        Pacific Telecom Communication Group is a common carrier.  Common carriers are not

5 subject to the jurisdiction of the FTC. Instead, common carriers are subject to the

6 jurisdiction of the Federal Communications Commission. ("FCC") To date, plaintiff's are

7 aware that they have been and are currently being investigated by the FCC and notices of

8 any kind have been received from the FCC for any violations.

9                                          13.

10       On or about early 2009 plaintiff's began to receive civil investigative demands from

11 various attorneys general regarding numbers alleged assigned to plaintiffs and of which

12 appeared on complaint forms from consumers alleging that these numbers appeared in their

13 caller ID handsets etc . . .  Plaintiff's similarly began to receive complaints from consumers

14 asking that the telemarketing calls displaying their numbers cease. Plaintiffs complied and

15 successfully stopped all unwanted calls. Plaintiffs sought legal advice regarding their business

16 model as it related to the TSR's and received such legal opinion from legal counsel. Counsel

17 opined that plaintiff's business model may be of interest to regulatory authorities but if

18 plaintiff's complied with the safe harbor provisions of the TSR's that while they may get some

19 attention from such authorities, that it was unlikely that it would result in any violations under

20 the law. Because such legal  advise came from one of plaintiff's nephews, Robert C. Rengo,

21 then a principal shareholder of plaintiff's, chose to not rely on such opinion and instead

22 engaged another law firm, MacMurray, Petersen and Schuster, LLP, whom held themselves

23 out as "experts in the field" for their legal opinion. Plaintiff's paid in excess of ten thousand

24 dollars for such opinion. On or about April of 2009, said law firm submitted their legal opinion

25 in a 13 page memorandum of law that in essence mirrored the opinion of their previous

26 attorney. They advised and compiled a handbook to be distributed to plaintiff's subscribers

[PTCG, TMC, et., al. FIRST AMENDED ANSWER, AFF. DEFS. AND COUNTERCLAIMS] - 23

advising how to comply with the TSR's which included, among other things, compliance with the safe harbor rules of the TSR's.

14.

During the course of defending another client in a similar TSR matter, plaintiff's counsel became aware that the governments position with regard to "facilitating" illegal telemarketing calls that the safe harbor does not apply. The government maintains that position to this day. Counsel has come to agree with the government that, as written, the TSR's while having safe harbor provision for both dropped calls and actual sellers or dialer, there is no such safe harbor for any alleged "facilitators". Stated another way, the people responsible for actually making the calls gets a get out of jail free card, but the alleged facilitators do not. (Unless, apparently, the facilitator acts as "watchdog" over all of its subscribers.)

15.

C.F.R. § 310(4) is unconstitutionally void for Vagueness in general or as applied to these defendants. A statute is unconstitutionally void for vagueness if a reasonable lay person is unable to determine what is required to comply with the statute. A statute is void for vagueness if it fails to give notice to an individual about what is the proscribed conduct to comply with the statute.

16.

In the case at bar, Plaintiff's engaged and paid for not one, but two separate legal opinions. One from experts in the field of telecommunications and consumer protection the other from counsel engaged in consulting in the telecommunications industry for over a decade. Each opinion stated that following a particular path of conduct would avoid liability under the TSR's. The FTC is currently seeking $1.8 million dollars in fines from plaintiffs for violating the TSR's prohibition on facilitating illegal telemarketing calls even though plaintiff's engaged legal counsel twice and followed each of their advised course of conduct in an effort

[PTCG, TMC, et., al. FIRST AMENDED ANSWER, AFF. DEFS. AND COUNTERCLAIMS] - 24

to comply with the federal statute. Given the fact that two or more competent attorneys could not (apparently) figure out a proscribed course of conduct to comply with the TSR's, it goes without saying that a reasonable lay person would find it similarly impossible. The TSR's facilitating statute contains NO language that describes the prohibited conduct. Case law on the subject is limited to cases of fraud where it defines what is prohibited conduct and in each of those cases, an agency relationship existed. (The FCC recently opined in the Dish Network case, that in order for there to be 3rd party liability under the Telephone Consumer Protection Act ("TCPA") that a plaintiff must plead and prove an agency relationship in order for liability to extend to third parties. The FTC has failed to allege any such relationship between the plaintiff's and each of the alleged sellers or callers and Counter–claimant's believe that they must do so to prove facilitating under the TSR's which basically prohibit the same conduct alleged by the FTC. (Violating the proscription of the TSR's by calling persons registered on the federal DNC data base.)

COUNT ONE

42 USC § 1983

17.

RETALIATORY PROSECUTION/SUPPRESSION OF SPEECH, PRIOR RESTAINT OF FREE SPEECH  UNDER THE FIRST AMENDMENT TO THE CONSTITUTION BY GREISMAN, MAXSON and Various John Doe's.

DEFENDANTS re–plead each of the previous paragraphs as though fully stated hereunder and incorporates them by reference. Greisman, Maxson, and current FTC counsel in this matter, Bikram Bandy et. al., had been investigating Defendants for approximately four years up until that fateful meeting in October of 2012. (And at all times subsequent to that meeting up to and including the date the FTC filed the instant action and beyond.) After the FTC' first investigation resulted in no fines or other sanctions being imposed on Defendants,

Defendants entered into an informal relationship with the FTC wherein Defendants supplied, at their own expense, information that lead to at least three litigations (and counting) for violations of the TSR's each of which resulted in the named Defendants entering into Consent orders, two of which, at this writing, were accepted and entered into by the respective Federal Courts. (Since that time, this *very court* has affirmed [Doc. 35] several consent orders that Defendants provided information to the FTC in order to effect such cases against such parties who entered into such consent orders.) At some point Defendant audited their expenses with respect to such cooperation and determined that they were spending as much as forty thousand dollars per year in such cooperation. On legal advise, Defendants informed Greisman, Maxson, et.al., that it would no longer provide information without the FTC sharing in such expense, such communication being a matter of public concern. Greisman, Maxson and others declined to compensate Defendants and Defendants ceased  participating in the "informal" agreement. (Defendants still answered all legal summons, CID's, etc . . . ) Within a short time thereafter Greisman, Maxson and current FTC counsel, Bikram Bandy, began efforts, in earnest to "bring down" Defendants legal businesses. This after Defendants had the nerve to ask for compensation for their efforts. The first amendment to the constitution guarantees, among other things, the right of freedom of speech. Defendants were and continue to be retaliated against for refusing to pay to do the FTC's bidding. Defendants are being punished for expressing themselves where the government has no substantial interest in suppressing counter–claimants speech or business. Nor did the FTC employees use the least restrictive means available to it.  The FTC litigation in the So. Dist. of Florida is punishment for verbally demanding compensation from the FTC and plaintiffs subsequent termination of the agreement to cooperate.  This action is attempt by the FTC restrain free speech by engaging in legitimate business and to inhibit anyone from demanding just compensation for voluntary cooperation with the federal government, further chilling Defendants and others, speech going forward. For years the FTC found no conduct that

would indicate contravention of the TSR's. That is until, Defendants stopped cooperating with the FTC and told them that they would not cooperate with the FTC absent formal requests and compensation.  The FTC is authorized to compensate private citizens for cooperating in an FTC investigations. Neither the FTC nor its employees are authorized to close down legal businesses, restrain their freedom of speech or demand closure of a legitimate business without a formal hearing. There is no compelling state interest in closing down a legitimate business or deterring free speech of the nature described herein. Greisman, Maxson et.al., violated protected speech by demanding that Defendants close their legal businesses, and cease in its requests for compensation for aiding FTC investigations, or face the wrath of the United States Government. The FTC  then instituted this civil action. Counter-claimants believe, on information and belief, that others conspired in and or participated, ratified, or encouraged the prohibited conduct and believes such individuals will be revealed during discovery.

COUNT TWO

42 U.S.C. § 1983

18.

AGAINST GREISMAN AND MAXSON UNDER THE FOURTEENTH AMENDMENT FOR VIOLATION OF DUE PROCESS OF LAW

DEFENDANTS re-plead each of the previous paragraphs as though fully stated hereunder and incorporates them by reference.

The FTC is a federal government administrative/enforcement agency for whom, at all relevant times, GREISMAN and MAXSON were/are duly employed. DEFENDANT'S are private citizens of the United States of America. While acting in their official capacity as employees/investigators of the FTC, and under the color of state title while in the employment of the FTC and the United States government, GREISMAN and MAXSON

1  intentionally violated DEFENDANT'S rights as citizens of the United States of America by,

2  among other things, finding them guilty of violating various federal and state statutes without

3  being accorded due process of law and forcing them, by way of viable, eminent threat of

4  severe sanctions, to close down a profitable, legal enterprise.  Greisman and Maxson knew or

5  should have known that their conduct would result in loss to counter–claimants and in fact,

6  loss has occurred. Greisman and Maxson should have conducted a formal administrative

7  hearing before imposing punishment on counter–claimants. As a direct and proximate cause of

8  Greisman' and Maxson' conduct Plaintiffs have suffered and continue to suffer extreme

9  financial loss and hardship.

10                                                  19.

11                                      PRAYER FOR RELIEF

12          WHEREFORE, with respect to each of Defendants counter claims they demand

13  compensation in an amount of FIVE MILLION DOLLARS or such other amounts to be

14  determined at trial pursuant to the Civil Rights Act of 1871, 42 U.S.C.

15   Section 1988; along with dismissal of the respective GOVERNMENT claims with prejudice,

16  fees and costs, including, but not limited to, reasonable attorney fees and any further relief

17  this court deems just and proper.

18

19  Respectfully submitted,

20

21                                          Dated this 6th day of April, 2016

22                                              /S/ F. Antone Accuardi,
                                             _____
23                                              F. Antone Accuardi, Esq.
                                              Counsel for Defendants,
                                             Accuardi, Remaining Corporate
24                                             Defendants

25

26